**STATE of Texas, Petitioner,**

**v.**

**Angelique NAYLOR and Sabina Daly, Respondents**

**In re State of Texas, Relator**

**No. 11–0114, No. 11–0222**

Supreme Court of Texas.

Argued November 5, 2013

OPINION DELIVERED: June 19, 2015

Daniel H. Branch, Dallas, for Amicus Curiae Daniel H. Branch.

Kelly J. Shackelford, Liberty Institute, Plano, for Amicus Curiae Warren Chisum and the Honorable Todd Staples.

Cleve W. Doty, Baker Botts LLP, Daniel T. Hodge, First Asst. Attorney General, David C. Mattax, Director of Defense Litigation, Office of the Attorney General, Greg W. Abbott, Attorney General of Texas, James D. Blacklock, Jonathan F. Mitchell, Solicitor General, Office of the Attorney General, Michael P. Murphy, Asst. Solicitor General, William J. "Bill" Cobb III, Office of the Attorney General, Austin, for Petitioner State of Texas.

Robert B. Luther, Law Offices of Robert B. Luther, P.C., Austin, for Respondent Sabina Daly.

James J. Scheske, James J. Scheske, PLLC, Austin, Jason P. Steed, Bell Nunnally & Martin LLP, Dallas, Jennifer Renee Cochran, Jennifer R. Cochran PC, Austin, for Respondent Angelique S. Naylor.

Justice Brown delivered the opinion of the Court, in which Chief Justice Hecht, Justice Green, Justice Johnson, and Justice Boyd joined.

This case arises from the State's attempt to intervene in a civil action after the trial court had already rendered final judgment. We must determine whether the court of appeals erred in holding the State lacks standing to appeal the judgment and, if not, whether the State is entitled to mandamus relief. We answer both questions in the negative, affirming the decision of the court of appeals and denying the State's petition for writ of mandamus.

## I

Texas residents Angelique Naylor and Sabina Daly were married in Massachusetts in 2004. A few years later, Naylor filed for divorce in Travis County. Because the two women were raising a child and operating a business together, Naylor hoped to obtain a judgment addressing their respective rights, some of which they had already settled in a suit affecting the parent-child relationship ("SAPCR").

■ The State of Massachusetts indisputably recognizes this same-sex marriage. Texas, however, adheres to the traditional definition of marriage and does not recognize same-sex unions. Our constitution unambiguously provides that "[m]arriage in this state shall consist only of the union of one man and one woman." TEX. CONST. art. I, § 32(a). And while other states allow same-sex unions, Texas is not "required to give effect to any public act, record, or judicial proceeding of any other State ... that is treated as a [same-sex] marriage under the laws" of that state. 28 U.S.C. § 1738C; see also TEX. FAM. CODE § 6.204(c)(1) (indicating Texas courts may not "give effect" to such arrangements).

Strategically emphasizing this aspect of Texas law, Daly originally contested the divorce, contending that section 6.204 of the Family Code deprives Texas courts of jurisdiction to implicitly recognize same-sex marriage by issuing divorce decrees to same-sex couples. While Daly recognized

the district court's jurisdiction over the controversy, *see id.* § 155.001(a), she argued the court could only declare the marriage void. She also contested the need to modify the recently settled SAPCR.

Although the trial court acknowledged Daly's concerns and the complex issues Naylor's petition raised, it did not resolve those issues, as the two women settled their differences over the course of a two-day hearing. At the end of the second day, the trial court orally granted an ostensible divorce "pursuant to the agreement [the parties had] recited into the record." Recognizing that divorce may not be available to same-sex couples in Texas, this record stipulated that the judgment "is intended to be a substitute for . . . a valid and subsisting divorce," and "is intended to dispose of all economic issues and liabilities as between the parties whether they [are] divorced or not." ·

Several lawyers from the Texas Attorney General's Office were present during the hearing and the announcement of the trial court's decision. The following day, the State filed a petition in intervention seeking "to oppose the Original Petition for Divorce and to defend the constitutionality of Texas and federal laws that limit divorce actions to persons of the opposite sex who are married to one another." The State also raised a plea to the jurisdiction urging the court to dismiss Naylor's petition. The State explained that the court lacked jurisdiction to render a divorce, but could declare the marriage void under Chapter 6 of the Family Code and pursuant to Daly's response to the divorce petition. The State had not previously attempted to intervene or otherwise make its interests known to the court.

Daly objected to this attempted intervention, alleging the State has no justiciable interest in the case and that it filed its petition late. Naylor echoed Daly's arguments in a motion to strike the intervention. Naylor also objected to the State's jurisdictional plea, arguing that Texas law is unconstitutional to the extent it withholds the remedy of divorce. The trial court held a hearing on the contested intervention but ultimately decided not to entertain the State's petition, emphasizing that the attempted intervention had come too late. The judge therefore did not rule on the motion to strike or the plea to the jurisdiction, but instead signed the judgment and encouraged the State to seek appellate review.

The court of appeals, however, dismissed the State's appeal for want of jurisdiction, holding the intervention untimely and finding no basis for appellate standing. *See generally State v. Naylor,* 330 S.W.3d 434 (Tex.App.–Austin 2011). The State then sought this Court's review, asking us to allow the intervention and to vacate the divorce. In the alternative, the State seeks a writ of mandamus ordering the district court to vacate its decree and dismiss the petition for want of jurisdiction.

**II**

We agree with the court of appeals that the State lacks standing to appeal the trial court's decree. Standing is a component of subject-matter jurisdiction, *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993), and appellate standing is typically afforded "only to parties of record," *Gunn v. Cavanaugh,* 391 S.W.2d 723, 724–725 (Tex.1965). Consequently, an appeal filed by an improper party must be dismissed. *Id.* We always have jurisdiction to resolve questions of standing and jurisdiction, and we do so via de novo review. *Villafani v. Trejo,* 251 S.W.3d 466, 467 (Tex.2008); *Tex. Dep't of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 646 (Tex.2004).

Over the course of this litigation, the State has raised three arguments regarding its right to appeal the disputed divorce decree. Before the trial court, the State insisted it had timely intervened and so is a party to the case. At the court of appeals, the State alleged standing both as a timely intervenor and under the virtual-representation doctrine. *See Motor Vehicle Bd. of Tex. Dep't of Transp. v. El Paso Indep. Auto. Dealers Ass'n, Inc.*, 1 S.W.3d 108, 110 (Tex.1999) (describing the doctrine). Now the State contends that various equitable considerations also provide a basis for appellate standing. We address each argument in turn.

### A

This Court has consistently recognized the State's right to defend Texas law from constitutional challenge.[1] However, as the court of appeals explained, the State did not timely intervene in this dispute and therefore is not a party of record. Our intervention doctrine is expansive but not without limits. Under Texas law, a third party "is not required to secure the court's permission to intervene." *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex.1990) (citations omitted). "Any party may intervene by filing a pleading, subject to being stricken [ ] by the court for sufficient cause on the motion of any party." TEX. R. CIV.

P. 60. Yet while the rules require no judicial permission and impose no intervention deadline, our common law dictates that a party may not intervene post-judgment unless the trial court first sets aside the judgment. *See First Alief Bank v. White*, 682 S.W.2d 251, 252 (Tex.1984) ("[A] plea in intervention comes too late if filed after judgment and may not be considered unless and until the judgment has been set aside." (citations omitted)).

In this case the trial court rendered final judgment when it orally announced the divorce. A court's judgment is its announcement of the resolution of the issues in a lawsuit and is rendered "when the trial court officially announces its decision in open court or by written memorandum filed with the clerk." *S & A Rest. Corp. v. Leal*, 892 S.W.2d 855, 857 (Tex. 1995) (citing *Comet Aluminum Co. v. Dibrell*, 450 S.W.2d 56, 58 (Tex.1970)) (other citations omitted). A trial court renders judgment orally when it announces rendition as a present act and not as an "intention to render judgment in the future." *Id.* at 858 (quoting *Reese v. Piperi*, 534 S.W.2d 329, 330 (Tex.1976)). Its judgment is final as of that date, even if the judgment is void or otherwise flawed.[2]

The record confirms the trial court had already rendered judgment when the State

---

1. *See generally State v. Hodges*, 92 S.W.2d 489 (Tex.2002) (allowing intervention where local candidate challenged constitutionality of election law); *Wilson v. Andrews*, 10 S.W.3d 663 (Tex.1999) (allowing intervention where statute allegedly infringed on city's home-rule powers); *Corpus Christi People's Baptist Church, Inc. v. Nueces Cnty. Appraisal Dist.*, 904 S.W.2d 621 (Tex.1995) (allowing intervention where church challenged aspects of tax code); *Terrazas v. Ramirez*, 829 S.W.2d 712, 721–22 (Tex.1991) (holding that Attorney General's "broad discretionary power" includes authority to settle actions contesting constitutionality of statutes).

2. *See Middleton v. Murff*, 689 S.W.2d 212, 213 (Tex.1985) (per curiam) (explaining that void judgments are subject to the rules of procedure); *Newsom v. Ballinger Indep. Sch. Dist.*, 213 S.W.3d 375, 380 (Tex.App.–Austin 2006, no pet.) ("Even a void judgment can become final for the purposes of appeal." (citation omitted)); *In re Vlasak*, 141 S.W.3d 233, 238 (Tex.App.–San Antonio 2004, no pet.) ("[T]he judgment is void if challenged, but it is no less final.").

attempted to intervene. On the second day of the preliminary divorce hearing, Daly and Naylor returned from lunch with a tentative settlement agreement, and Daly's attorney read the terms into the record. This settlement "dispose[d] of all economic issues and liabilities as between the parties." After dictating the terms of the agreement, counsel asked Daly whether she was "asking that the Court grant [ ] a divorce today?" Daly responded simply, "I am." The judge then turned to Naylor and asked, "[A]re you also asking me to grant a divorce in this case?" When she responded that she was, the trial court announced, "The divorce is granted pursuant to the agreement you have recited into the record."

Because this oral pronouncement disposed of all issues between the two parties, and because the trial court indicated its intent to render immediate judgment, the announcement served as a binding judgment effective as of that moment. *See Dunn v. Dunn*, 439 S.W.2d 830, 833 (Tex. 1969) (explaining that final judgment is rendered when court orally announces its decision to grant divorce). The State's petition was therefore not timely when filed the next day, and the trial court chose not to set aside the judgment to entertain the State's arguments. Accordingly, and as a simple matter of fact and record, the State is not party to the case. The State's attempted appeal is thus improper unless it can establish an alternate basis for standing.

**B**

 Although the right to appeal is generally limited to parties of record, a third party may file an appeal where the prospective appellant is "deemed to be a party" under the doctrine of virtual representation. *El Paso*, 1 S.W.3d at 110 (citations omitted). But to benefit from that doctrine, the prospective appellant must establish: "(1) it is bound by the judgment; (2) its privity of estate, title, or interest appears from the record; and (3) there is an identity of interest between the appellant and a party to the judgment." *Id.* (citing *Continental Cas. Co. v. Huizar*, 740 S.W.2d 429, 432 (Tex.1987) (Kilgarlin, J., concurring)). In the case before us, even the State concedes it cannot satisfy the elements of the doctrine.

To begin with, the State is not bound by the disputed divorce decree, which settles various domestic matters and indicates that the women wish to dissolve any marital union that might exist. For example, the contested judgment does not financially obligate the State in any respect. *Cf. Tex. Mut. Ins. Co. v. Ledbetter*, 251 S.W.3d 31, 36 (Tex.2008) (allowing insurance carrier to appeal following settlement); *In re Lumbermens Mut. Cas. Co.*, 184 S.W.3d 718, 725 (Tex.2006) (same). Nor does the judgment preclude the State from exercising any of its rights. *Cf. El Paso*, 1 S.W.3d at 110–111 (allowing State's appeal where trial court unexpectedly enjoined "all officials" from enforcing disputed statute). The State likewise alleges no interest in the terms of the settlement and already maintains that the women are not legally married. The decree does not bind the State in any way.

Nor has the State established identity of interest. In attempting to do so, the State relies heavily on *El Paso*, describing that case as "remarkably similar" to the circumstances at issue here. We disagree. *El Paso* arose from a constitutional challenge by a group of automobile dealers seeking to enjoin enforcement of certain statutory restrictions on their industry. 1 S.W.3d at 110. After filing suit against local officials, the dealers notified the State of the constitutional challenge, as required by Texas Civil Practice and Remedies

Code section 37.006(b). *Id.* Upon receiving this notice, the State declined to intervene, explaining that the local authorities could·"adequately present the issues to the court." *Id.* at 111. Unbeknownst to the State, the trial court eventually issued an order declaring the statute unconstitutional and enjoining enforcement of certain provisions. *Id.* at 110. When the trial court refused ·to allow the State to intervene to contest the adverse decision, the State filed notice of appeal notwithstanding its undisputed status as a non-party. *Id.* This Court ultimately deemed the appeal proper, conferring third-party appellate standing via virtual representation. *Id.*

The court of appeals has already thoroughly explained how *El Paso* is distinguishable from this case. *See* 330 S.W.3d at 439–43. For present purposes, we note that in *El Paso* the State established the identity of interest notably absent here. The defendants in that case were fellow government entities imbued with shared authority to enforce the statutory restrictions the plaintiffs challenged. As the *El Paso* court of appeals explained:

> These [challenged] statutes display the privity and identity of interest between the parties to the suit and the Attorney General and Motor Vehicle Division. Both the Attorney General and the Motor Vehicle Division, like the [defendants], have a duty to enforce the challenged sections. In fact, the Attorney General derives enforcement power from the very same statute giving enforcement powers to the parties who participated in this case.

966 S.W.2d 783, 785 (Tex.App.1998) (citing TEX. TRANSP. CODE § 728.004(a)). Consequently, the State's interest in the case— its right to enforce the statutory scheme— was identical to that of the defendants.

We find no analogous identity of interest between the State and the parties to this dispute. The State contends Daly represented its interests at the trial court, as ·she originally contested Naylor's divorce petition. Yet the interests of Daly—who at all times asserted the legitimacy of her same-sex marriage—were never aligned with the State's. Although Daly ostensibly contested the divorce and even submitted briefs outlining the State's proposed alternate procedure for same-sex couples, Daly's counsel expressly distanced himself and his client from the State's position, explaining that he had "been given a lot of trouble about taking a position that from a theoretical and intellectual standpoint [he] might disagree with." He also expressed uncertainty as to whether the State's voidance procedure would offer the relief requested, in direct contravention of the State's position on the matter. This is hardly zealous advocacy on behalf of the State of Texas, and it is certainly not the identity of interest necessary for the virtual-representation doctrine to apply. For these and the other reasons the court of appeals provides, we conclude that the doctrine cannot confer appellate standing upon the State.

### C

Recognizing that its predicament "does not map perfectly onto the virtual-representation doctrine," the State urges this Court to find an equitable basis for appellate standing in light of the unusual importance of the issues presented. We appreciate the significance of the State's substantive arguments. As a sovereign entity, the State has an intrinsic right to enact, interpret, and enforce its own laws. *See Printz v. United States,* 521 U.S. 898, 912 n.5, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (explaining that all three branches of government inhere within the states' "nature as sovereigns").

This is particularly true with respect to law regarding the family, which is typically the "exclusive province of the States." *Sosna v. Iowa,* 419 U.S. 393, 404, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). The people and their duly elected representatives enacted these statutes; they reflect the deeply held beliefs of Texas voters. *See De Leon v. Perry,* 975 F.Supp.2d 632, 642–43 (W.D.Tex.2014) (explaining that the constitutional proposal prevailed in both houses of the Legislature and the subsequent referendum passed with "approximately 76% of the [popular] vote"). As a consequence, any challenge to our marriage law is an affront not only to the laws themselves, but also to the people of Texas. *See Veasey v. Perry,* 769 F.3d 890, 895 (5th Cir.2014) (referring to the public interest in state legislation).

■ Yet while we recognize the import of the State's statutory and constitutional arguments, the State has identified no equitable doctrine that might allow it, as neither a factual nor virtual party, to seek appellate review of the trial court's judgment. The State insists this Court "has never limited post-judgment intervention to the virtual-representation context," but the State cites no precedent in which we allowed a third party to appeal without first satisfying the essential elements of the virtual-representation doctrine. The State further contends, "[T]he virtual-representation doctrine is not a crisp rule with sharp corners and must be determined on a case-by-case basis." This is true, in the sense that even where a third party satisfies the virtual-representation doctrine, intervention may yet be denied when it is unjust to existing parties. *See Lumbermens,* 184 S.W.3d at 725 ("[B]ecause the doctrine is equitable, we must determine whether other considerations weigh against applying the doctrine" to allow mandamus relief from trial court's refusal

to allow post-judgment intervention.). But it does not follow that this equitable doctrine, as we have applied it historically, empowers the Court to create standing where none exists.

■ Indeed, in attempting to establish a right to third-party appeal the State conflates the question of whether a party with standing should be allowed to intervene on appeal with the predicate question of whether the party has standing at all. To be sure, "the right of intervention is ultimately rooted in equity." *Zeifman v. Michels,* 229 S.W.3d 460, 464 (Tex.App.–Austin 2007, no pet.) (citing *Highlands Ins. Co. v. Lumbermen's Mut. Cas. Co.,* 794 S.W.2d 600, 601 (Tex.App.–Austin 1990, no pet.)). As a result, Texas courts allow post-judgment intervention only upon careful consideration of any prejudice the prospective intervenor might suffer if intervention is denied, any prejudice the existing parties will suffer as a consequence of untimely intervention, and any other circumstance that may "militat[e] either for or against [the] determination." *Lumbermens,* 184 S.W.3d at 726 (quoting *Ross v. Marshall,* 426 F.3d 745, 754 (5th Cir.2005)); *see also Ledbetter,* 251 S.W.3d at 36 (explaining that late intervention is possible only where justice so requires and "there is neither unnecessary delay nor prejudice to the existing parties").

■ Yet before this Court or the court of appeals can evaluate the equity of intervention, the prospective intervenor must establish its standing to present its argument on appeal. *See Heckman v. Williamson Cnty.,* 369 S.W.3d 137, 151 (Tex.2012) ("The court must consider this threshold question even before reaching the separate issue of whether it can certify the putative class." (citation omitted)). Indeed, "[s]tanding is a prerequisite to subject-matter jurisdiction, and subject-matter jurisdiction is essential to a court's

power to decide a case." *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 553–54 (Tex.2000). Consequently, the existence of standing—or the lack thereof—is a rigid question of law that is not negotiable and cannot be waived. *Tex. Ass'n of Bus.,* 852 S.W.2d at 445. Neither this Court nor the court of appeals has the authority to expand the scope of its jurisdiction, the bounds of which are determined by our constitution and the Legislature.[3] We have no power to adopt the novel jurisdictional approach the State proposes, and we affirm the court · of appeals' decision to dismiss the case for want of jurisdiction.

### III

In his dissenting opinion, JUSTICE WILLETT contends the State has standing to present its arguments and urges this Court to determine whether the trial court should have entertained the State's petition in intervention. Yet even assuming this Court has jurisdiction to reach that question, we would find no abuse of discretion in the trial court's decision not to consider the untimely petition.

The record reveals that the State, while fully aware of the public import of this private dispute, had adequate opportunity to intervene and simply failed to diligently assert its rights. This is not a case in which the State was unaware of the litigation or blindsided by the result. *Cf. El Paso,* 1 S.W.3d at 110–111. On the contrary, the State concedes it had monitored this ongoing dispute for months and could have intervened if it had chosen to do so. Indeed, the State had recently intervened in a similar dispute[4] and so had already prepared its legal arguments. So it likely would have required relatively little effort for the State to file a petition in intervention or submit an amicus letter informing the trial court of its concerns. Yet there is no record that the State made any such effort until after the trial court rendered judgment.

More importantly, where the Legislature has given no indication to the contrary the State must abide by the same rules to which private litigants are beholden. As we have already explained, "a plea in intervention comes too late if filed after judgment and *may not be considered unless and until the judgment has been set aside.*" *White,* 682 S.W.2d at 252 (emphasis added) (citing *Comal Cnty. Rural High Sch. Dist. No. 705 v. Nelson,* 158 Tex. 564, 314 S.W.2d 956 (1958)). A trial court has discretion to set aside its judgment in light of an untimely petition in intervention. *See* TEX. R. CIV. P. 329b(d) (affording trial courts thirty days to "vacate, modify, correct, or reform" judgment). Even so, the State did not ask the court to set aside or otherwise revisit the disputed divorce decree. *Cf. Terrazas,* 829 S.W.2d at 726 (finding abuse of discretion

---

3. *See Chenault v. Phillips,* 914 S.W.2d 140, 141 (Tex.1996) (per curiam) ("This Court's jurisdiction, like that of all Texas courts, is conferred solely by the Texas Constitution and state statutes."). Nor would it be prudent to define standing as a variable function of miscellaneous political and equitable factors. The United States Supreme Court has repeatedly emphasized the folly of these jurisdictional concessions. "[T]he policy goal of minimizing litigation over jurisdiction is thwarted whenever a new exception ... is announced." *Grupo Dataflux v. Atlas Global Grp., L.P.,* 541 U.S. 567, 580–81, 124 S.Ct.

1920, 158 L.Ed.2d 866 (2004). In this case, well-settled principles indicate the State did not timely intervene, the virtual-representation doctrine does not apply, and the State has no standing to appeal the disputed decree. To hold otherwise would exceed our authority and undermine the governing body of law.

4. *See In re Marriage of J.B. and H.B.,* 326 S.W.3d 654, 659 (Tex.App.–Dallas 2010, pet. dism'd).

in refusal to allow post-judgment intervention where prospective intervenor moved for new trial in lieu of motion to set aside judgment). The State instead ignored the decree altogether, insisting the court lacked jurisdiction over the petition and therefore had no authority to adjudicate the dispute. Perhaps the State believed the judgment to be void *ab initio*, but even a flawed judgment is subject to our precedent and must be set aside before intervention is possible. *Middleton*, 689 S.W.2d at 213. Even when the presiding judge explained that he had already rendered judgment, the State maintained its original arguments and did not ask the court to set the decree aside so that intervention might be allowed. Nor has the State identified any authority requiring a judge to do so. Given the court's plenary authority over its order[5] and the State's failure to present its intervention argument in a manner consistent with governing precedent, the trial court did not abuse its discretion in declining to allow the contested intervention.

## IV

▮▮▮▮ The State also seeks mandamus relief from the trial court's adjudication of the divorce petition.[6] A writ of mandamus is an extraordinary remedy available "to correct an action of a trial judge who commits an abuse of discretion or a violation of a clear duty under the law." *State v. Walker*, 679 S.W.2d 484, 485 (Tex.1984) (citing *State Bar v. Heard*, 603 S.W.2d 829, 834 (Tex.1980)). Naylor and Daly dispute this Court's authority to reach the mandamus petition, alleging the State lacks the "justiciable interest" necessary to establish standing to raise a mandamus challenge to the disputed court order. *See Terrazas*, 829 S.W.2d at 723, 726 (allowing non-party to raise post-judgment mandamus challenge once it established "justiciable interest" in the judgment). We need not resolve the question of justiciable interest. Even assuming the State has standing to bring a mandamus action, its petition fails on the merits.

▮▮▮▮ The Supreme Court of Texas shares mandamus jurisdiction with the courts of appeals. *See* Tex. Gov't Code §§ 22.002(b), 22.221. Although a relator may file a petition for writ of mandamus directly with this Court, these petitions usually originate in the lower courts. "If [a] petition is filed in the Supreme Court without first being presented to the court of appeals, the petition must state the compelling reason why the petition was not first presented to the court of appeals." Tex. R. App. P. 52.3(e). The State argues it did not file a mandamus petition in the court of appeals because it thought it would have standing to appeal. A litigant's mistaken understanding of law is

---

5. *See Equitable Gen. Ins. Co. of Tex. v. Yates*, 684 S.W.2d 669, 670 (Tex.1984) (describing the trial court's "great discretion" to decide whether to set aside judgment); *Conwill v. Gulf, C. & S.F. Ry. Co.*, 85 Tex. 96, 19 S.W. 1017, 1020 (1892) ("The court had the power to set aside the judgment, even having overruled an application for a new trial; but the exercise of this power is confided to its sound discretion."); *Childs v. Mayo*, 73 Tex. 76, 11 S.W. 154, 154 (1889) ("It is not a matter of course to set aside the judgment, but rather an exercise of the equitable discretion of the court upon the presentation of sufficient cause."); *Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280, 294–95 (Tex.App.–Dallas 2009, no pet.) (describing the court's discretion as "practically unlimited" and "virtually absolute" (quoting *Rogers v. Clinton*, 794 S.W.2d 9, 12 (Tex.1990) (Cook, J., dissenting))).

6. The State does not request mandamus review of the court's refusal to entertain the petition in intervention. *Cf. Terrazas*, 829 S.W.2d at 726 (granting relief from trial court's rejection of untimely intervention where intervenors lacked standing to appeal but sought writ of mandamus).

not a compelling reason for this Court to consider an unreviewed mandamus argument. The proffered reason seems particularly unpersuasive here, where just a few weeks earlier and with respect to the very same constitutional question, the State recognized the need to seek both appellate *and* mandamus relief from the court of appeals.[7]

 The State further contends it did not submit its mandamus arguments to the court of appeals because the effort would have been futile. Specifically, the State describes the lower court as having "already made clear" its skepticism of the State's arguments. But the record belies this description—the court of appeals found no jurisdiction over the appeal and did not reach the merits of the State's arguments. *See Naylor*, 330 S.W.3d at 444 n.9 ("Having determined that we lack subject-matter jurisdiction over this appeal, we express no opinion on the remaining issues raised by the State."). Moreover, a party may not circumvent the court of appeals simply by arguing futility. This Court rejected the same argument under similar circumstances, insisting that the relator first seek relief from the court of appeals before approaching this Court. *See In re Lumbermens Mut. Cas. Co.*, 184 S.W.3d 729, 730 (Tex.2006) (per curiam) (denying belated intervenor's mandamus petition where relator alleged the court of appeals had already rejected its arguments on direct appeal). Accordingly, we deny the State's petition for writ of mandamus.

## V

Finally, we would be remiss not to acknowledge JUSTICE DEVINE's careful and thorough treatment of the constitutional questions presented to the Court. The State asks us to determine whether Texas has a constitutional right to define marriage and whether state law precludes the trial courts from offering divorce to same-sex couples. We have no quarrel with JUSTICE DEVINE's analysis. Nevertheless, the same constitutional principles that reserve each state's right to govern marriage also constrain the judiciary by limiting our reach to the adjudication of live controversies brought by parties with standing to appear before the courts. *See* U.S. CONST. art. III, § 2, cl. 1; *Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 971 S.W.2d 439, 442–43 (Tex.1998) (citing TEX. CONST. art. II, § 1; art. IV, §§ 1, 22; and art. V, § 8); *Tex. Ass'n of Bus.*, 852 S.W.2d at 444 ("[W]e have construed our separation of powers article to prohibit courts from issuing advisory opinions because such is the function of the executive rather than the judicial department." (citations omitted)).

The constitutional questions presented here are raised by a litigant that failed to secure standing by properly presenting its arguments to the trial court and court of appeals. Consequently, this Court has no jurisdiction to reach those issues. *See Douglas v. Delp*, 987 S.W.2d 879, 882 (Tex. 1999) (dismissing claims after finding plaintiff lacked standing). Moreover, neither of the lower courts addressed the merits of the constitutional issues raised. Therefore, even if the State could establish standing to present these arguments, we would have little choice but to remand those issues to one of the lower courts.

---

7. *See In re Marriage of J.B.*, 326 S.W.3d at 659 (referring to both petitions). Equally unpersuasive is the State's argument that extraordinary relief is warranted because it has no remedy at law. The State would have had an adequate remedy if, at any point in its obser- vation of this dispute, it had timely intervened and secured its right to direct appeal. *See Walker*, 679 S.W.2d at 485 (holding writ available only "when there is no other adequate remedy at law").

*See Wal–Mart Stores, Inc. v. McKenzie,* 997 S.W.2d 278, 280–81 (Tex.1999) (per curiam) (remanding arguments where the court of appeals erred in deeming them waived). In short, "we reaffirm the well-settled prudential doctrine that cases should be decided on narrow, non-constitutional grounds whenever possible." *Van-Devender v. Woods,* 222 S.W.3d 430, 433 (Tex.2007).

Like JUSTICE DEVINE, we would appreciate the opportunity to address the merits of this issue of critical importance at this crucial juncture in our nation's history. Yet we must respect the bounds of our jurisdiction by addressing only the questions immediately before the Court. Having already done so, and for the reasons stated herein, we affirm the decision of the court of appeals and deny the State's petition for writ of mandamus.

Justice Boyd filed a concurring opinion.

Justice Willett filed a dissenting opinion, in which Justice Guzman and Justice Devine joined.

Justice Devine filed a dissenting opinion.

Justice Lehrmann did not participate in the decision.

Justice Boyd, concurring.

I join the Court's opinion and judgment, and particularly its conclusion that we cannot rely on equity to create standing for the State on appeal. But more importantly, I write separately to emphasize a point on which everyone agrees: the State of Texas is not bound by the divorce decree at issue in this case.

The underlying issues are critically important, but I agree with the Court that we cannot reach them because the State lacks standing to pursue this appeal. Although the State enjoys unique immunities, it "is subject to [procedural rules] as any other litigant." *Lowe v. Tex. Tech Univ.,* 540 S.W.2d 297, 301 (Tex.1976). One such rule—"an elementary principle, which has come down to us from the earliest days of the common law"—provides that only those with a justiciable interest in a trial court's judgment have standing to appeal:

> It was decided by this court, as long ago as the case of *Smith v. Gerlach,* 2 Tex. 424, and has never been since questioned, "that this writ [of error] can only issue at the instance of a party to the suit, or of one whose privity of estate, title, or interest appears from the record of the cause in the court below, or who may be the legal representative of such party."

*Wood v. Yarbrough,* 41 Tex. 540, 542 (1847) (quoting *Smith v. Gerlach,* 2 Tex. 424, 426 (1847)).

The State was not a party to this suit. Although it attempted to intervene after the trial court rendered judgment, a post-judgment petition in intervention is ineffective unless the trial court sets aside its judgment. *First Alief Bank v. White,* 682 S.W.2d 251, 252 (Tex.1984) (per curiam); *see also Dunn v. Dunn,* 439 S.W.2d 830, 831–33 (Tex.1969) (explaining that court renders final judgment when it orally announces its decision to grant divorce). Here, the trial court did not set aside its judgment, and the State never asked it to. Nor can the State appeal under the virtual representation doctrine because, as all parties agree, (1) the State is not bound by the judgment, (2) there is no privity of interest reflected in the record, and (3) there is no identity of interest between the State and any party to the judgment. *Motor Vehicle Bd. of Tex. Dep't of Transp. v. El Paso Indep. Auto. Dealers Ass'n, Inc.,* 1 S.W.3d 108, 110 (Tex.1999). And finally, the State is not the legal representative of anyone who was a party in the trial court.

"Subject matter jurisdiction is essential to the authority of a court to decide a case," and "[s]tanding is implicit in the concept of subject matter jurisdiction." *Tex. Ass' n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex.1993). "An opinion issued in a case brought by a party without standing is advisory because rather than remedying an actual or imminent harm, the judgment addresses only a hypothetical injury." *Id.* at 444. We "have no jurisdiction to render such opinions." *Id.* Courts cannot presume or create standing and jurisdiction, even for equitable reasons. In his dissent, JUSTICE WILLETT correctly notes that we have recently referred to virtual representation as an "equitable" doctrine. *See post* at 802 (Willett, J., dissenting) (citing *In re Lumbermens Mut. Cas. Co.*, 184 S.W.3d 718, 722 (Tex.2006)).[1] But the Court has it right: the role of equity in this arena is to *limit* the right to appeal when a non-party has standing under the virtual representation doctrine, not to *create* a right to appeal when the non-party lacks standing. A non-party who meets the requirements of virtual representation has standing as one who is "deemed to be a party" and "entitled" to appeal because it has a justiciable interest in and is bound by the judgment. *In re Lumbermens*, 184 S.W.3d at 722–23; *see also City of San Benito v. Rio Grande Valley Gas Co.*, 109 S.W.3d 750, 755 (2003) ("[T]he most impor-

tant consideration is whether the appellant is bound by the judgment.").

We have never said, as JUSTICE WILLETT asserts, that a non-party can appeal even if it does not meet the requirements of virtual representation. When we quoted the First Circuit's observation that the doctrine is not "a crisp rule with sharp corners" and must be applied on a case-by-case basis, *see In re Lumbermens*, 184 S.W.3d at 725 (quoting *Gonzalez v. Banco Cent. Corp.*, 27 F.3d 751, 761 (1st Cir. 1994)), we did so to support our explanation that, "because the doctrine is equitable, we must determine whether other considerations *weigh against* applying the doctrine to allow Lumbermens' intervention on appeal." *Id.* (emphasis added). A non-party appellant must meet the requirements of the virtual representation doctrine, but even when it does, equity may limit its right to appeal. *Id.* at 722 (party who "meets the requirements" may "assert the virtual-representation doctrine ... if equitable considerations do not weigh against allowing [it] to participate on appeal"); *id.* at 726 ("equitable factors may weigh against allowing a virtually-represented party to invoke appellate rights"); *see also Tex. Mut. Ins. Co. v. Ledbetter*, 251 S.W.3d 31, 36 (Tex.2008) (party who meets requirements "can intervene even after judgment or on appeal so

1. Our reference to virtual representation as an "equitable" doctrine appears to be a recent development. Neither *El Paso* nor any of the cases on which we relied in *El Paso*— or even on which any of those cases relied– ever use the word "equity" or "equitable" to describe the virtual representation doctrine. *See, e.g., El Paso*, 1 S.W.3d at 110 (discussing virtual representation doctrine while making no reference to "equity" or "equitable"); *Robertson v. Blackwell Zinc Co.*, 390 S.W.2d 472, 472 (Tex.1965) (same); *Gunn v. Cavanaugh*, 391 S.W.2d 723, 724 (Tex.1965) (same); *Wood*, 41 Tex. at 542 (same); *Smith*,

2 Tex. at 426 (same). We used the word "equitable" once in *Gunn*, but did so to describe the non-party's proper remedy, *as opposed to* an appeal. *Gunn*, 391 S.W.2d at 724 (explaining that non-party's "proper remedy is by way of an equitable proceeding in the nature of a trial court bill of review," and not by appeal). The only instance in which our earlier cases refer to the doctrine as "equitable" was in a dissenting opinion. *Cont'l Cas. Co. v. Huizar*, 740 S.W.2d 429, 433 (Tex.1987) (Gonzalez, J., dissenting) (referring to "the equitable doctrine of virtual representation").

long as there is neither unnecessary delay nor prejudice to the existing parties").

Just as a non-party who seeks to intervene before judgment must have a justiciable interest and standing, *see Mendez v. Brewer*, 626 S.W.2d 498, 499, 500 (Tex. 1982) ("The intervenor bears the burden to show a justiciable interest" and "standing to intervene"), so must a non-party who seeks to appeal post-judgment. Whether pre-judgment or post-judgment, it is not true, as JUSTICE WILLETT's dissent asserts, that "[i]ntervention is an equitable doctrine" under which judges can "simply balance the equities differently." *Post* at 799. The intervenor must have a justiciable interest, but even then equity may justify a denial of their intervention in a given case. Here, because the State was not a party or representative of a party and cannot be deemed a party under the virtual representation doctrine, it lacks standing to pursue its appeal, and no amount of equity can overcome that barrier.[2]

But the State lacks standing to appeal because it was not a party, it shared no privity or interest with any party, and the trial court's judgment is not binding on it. The virtual representation doctrine does not apply here precisely because the judgment is not binding on the State. *City of San Benito*, 109 S.W.3d at 755 (agreeing that "the most important consideration"

when deciding whether the virtual representation doctrine applies "is whether the appellant is bound by the judgment"). We cannot overlook the effect of this reality. As a non-party who is not bound by the judgment, the State has no obligation to give any effect to the trial court's divorce decree. In fact, it may be, as the State contends, that our laws *prohibit* the State and all of its agencies and political subdivisions from giving any effect to the decree. However controversial and fluid these social issues may currently be, the Texas Constitution still provides that "[m]arriage in this state shall consist only of the union of one man and one woman," and "[t]his state or a political subdivision of this state may not create or recognize any legal status identical or similar to marriage." TEX. CONST. art. I, § 32. And Texas statutes still provide that "[a] marriage between persons of the same sex . . . is contrary to the public policy of this state and is void in this state," and "[t]he state or an agency or political subdivision of the state may not give effect to" a:

(1) public act, record, or judicial proceeding that creates, recognizes, or validates a marriage between persons of the same sex or a civil union in this state or in any other jurisdiction; or

(2) right or claim to any legal protection, benefit, or responsibility assert-

---

**2.** I also agree with the Court that we must deny the State's alternative petition for writ of mandamus. As Justice Willett notes, we have stated that a person "need not be a party to the underlying litigation in order to seek mandamus relief." *Post* at 810 (quoting *Terrazas v. Ramirez*, 829 S.W.2d 712, 723 (Tex.1991)). But we made that statement immediately after stating that, "[t]o be entitled to mandamus, relators must have a justiciable interest in the underlying controversy." *Terrazas*, 829 S.W.2d at 723. We allowed the relators to pursue mandamus in that "most unusual . . .

procedural quagmire" even though they were not parties in the trial court, *id.* at 725, but only because they, "as registered voters," had "a justiciable interest" in the case, *id.* at 723. Setting aside the concerns about the State's failure to seek such relief in the court of appeals, we can only grant mandamus when the trial court abuses its discretion or violates a clear duty under the law. *State v. Walker*, 679 S.W.2d 484, 485 (Tex.1984). For the reasons the Court explains, I cannot conclude that the trial court abused its discretion by refusing to permit the State's late-filed plea in intervention.

ed as a result of a marriage between persons of the same sex or a civil union in this state or in any other jurisdiction.

TEX. FAM. CODE § 6.204(b), (c).

The State has argued that these provisions prohibit Texas courts from granting a divorce to a same-sex couple that was married in another state because only married couples can get divorced in Texas, and these provisions prohibit courts from recognizing same-sex couples as being married. Naylor counters that courts can grant divorces without recognizing the validity of or giving effect to the marriage, and in any event, the Texas Constitution and statute are void because they violate the federal constitution. The State finds support for its arguments in the Dallas court of appeals' decision in *In re Marriage of J.B. & H.B.*, 326 S.W.3d 654 (Tex. App.–Dallas 2010, pet. dism'd). That court held that (1) "[t]he Texas Constitution and section 6.204 . . . forbid the State and its agencies from giving *any effect whatsoever* to a same-sex marriage" and thus "preclude[ ] a trial court from giving any legal effect to [a same-sex] petition for divorce," (2) "neither comity nor the place-of-celebration rule overcome the jurisdictional bar of section 6.204(c)(2)," and (3) "Texas's laws providing that its courts have no subject-matter jurisdiction to adjudicate a petition for divorce by a party to a same-sex marriage do not violate the Equal Protection Clause of the Fourteenth Amendment." *Id.* at 665–66, 669, 681. Today, we have dismissed the petition for review in *J.B. & H.B.* as moot, because one of the parties died after the petition was filed.

Because the State lacks standing to appeal here, we lack jurisdiction to address these issues, which leaves the Dallas court's opinion as the only currently existing Texas law on these issues.

Although we cannot address the issues here, what we can do and have done is confirm that, as the parties agree, the trial court's divorce decree in this case is not binding on the State. As a non-party to this litigation, the State is not required to recognize the validity of this (or any other) same-sex divorce decree, and the Constitution and Family Code may in fact prohibit the State and its agencies and political subdivisions from doing so. If the State's arguments are correct, then under Texas law Naylor and Daly are neither married nor divorced, and neither the State nor any agency or political subdivision can treat them otherwise.

Of course, we may have the opportunity in a future case to address these arguments. And as JUSTICE WILLETT notes, the United States Supreme Court may resolve Naylor's federal constitutional arguments before we have that opportunity. *See post* at 799 n.1. But unless and until a court with proper jurisdiction announces otherwise, the trial court's judgment in this case is not binding on the State.

Justice Willett, joined by Justice Guzman and Justice Devine, dissenting.

Quite soon—within days—the Supreme Court of the United States will decide a core constitutional controversy: whether the United States Constitution commands a 50–state right to same-sex marriage.[1]

---

1. *See Obergefell v. Hodges*, 772 F.3d 388 (6th Cir.2014), *cert. granted,* —— U.S. ——, 135 S.Ct. 1041, 190 L.Ed.2d 908 (2015). The combined petitions, addressing four states' bans on same-sex marriage, actually pose two discrete constitutional questions. First is the so-called "celebration" issue: Can states con-

stitutionally forbid same-sex couples from marrying? Second is the related-but-distinct "recognition" issue: Can states constitutionally refuse to accept the legality of same-sex marriages performed elsewhere? Today's case presents a spin-off "dissolution" issue:

Two years ago in *United States v. Windsor*,[2] the Court, noting an "evolving understanding of the meaning of equality,"[3] sparked a constitutional revolution. In the 723 days since, the number of states where same-sex unions are legal has more than tripled—from twelve to thirty-seven–three via popular vote,[4] eight via legislative action,[5] and twenty-six via judicial decree.[6]

"Who decides?" is a fateful question. A generation ago in *Baker v. Nelson*,[7] the U.S. Supreme Court ruled in a succinct, one-sentence order that a state's preference for opposite-sex marriage raised no "substantial federal question."[8] Is *Baker* a rule or a relic? Is marriage law still "a virtually exclusive province of the states"[9] —resting properly with state voters and their elected representatives rather than with judges—or has *Baker* been swamped by doctrinal developments, overtaken if not overruled?

The High Court in Washington, D.C. will soon speak. The High Court in Austin, Texas will not. This Court holds the merits are unreachable because of an insurmountable procedural hurdle that, distilled down, poses fundamental questions about the attorney general's powers, including his ability to defend Texas law against perceived, implicit constitutional attack. Specifically, the Court concludes the attorney general blundered the State's right to intervene, rendering the State of Texas procedurally powerless to assert its argument that Texas law deprives state courts of jurisdiction in, same-sex divorce proceedings. More to the point: This Court lacks jurisdiction to say Texas courts lack jurisdiction.

Today's decision turns on state procedural law, not federal constitutional law, but procedural matters matter. Intervention is an equitable doctrine, and I simply balance the equities differently. Some may frame this case as a purely *private* dispute, which is precisely the issue: whether weighty *public* concerns—the application and constitutionality of Texas marriage law—are sufficiently intertwined to warrant hearing from the State. In my view, the State's chief legal officer—sworn to "preserve, protect, and defend" Texas

Can states constitutionally refuse to grant same-sex divorces?

2. —— U.S. ——, 133 S.Ct. 2675, 186 L.Ed.2d 808 (2013).

3. *Id.* at 2693.

4. *See* Me. Rev. Stat. tit. 19–A, § 650–A (2012); Md. Code Ann., Fam. Law §§ 2–201, 2–202 (2013); Wash. Rev. Code Ann. § 26.04.010 (2012).

5. Del. Code Ann. tit. 13, § 129 (2013); Haw Rev Stat. § 572–1 (2013); 750 Ill. Comp. Stat. 80/10 (2014); Minn. Stat. § 517.01 (2013); N.H. Rev. Stat Ann. § 457:1–a (2010); N.Y. Dom. Rel. Law § 10–a (McKinney 2011); R.I. Gen. Laws § 15–1–1 (2013); Vt. Stat. Ann. tit. 15, § 8 (2009). The District of Columbia has also legalized same-sex unions via legislative action. D.C. Code § 46–401 (2010).

6. *See, e.g., Latta v. Otter*, 771 F.3d 456 (9th Cir.2014), *petition for cert. filed,* (U.S. Dec. 30, 2014) (No. 14765) (invalidating Idaho and Nevada bans on same-sex marriage under the federal Constitution); *Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir.), *cert. denied,* —— U.S. ——, 135 S.Ct. 265, 190 L.Ed.2d 138 (2014) (same for Utah); *Bostic v. Schaefer*, 760 F.3d 352 (4th Cir.), *cert. denied,* —— U.S. ——, 135 S.Ct. 286, 190 L.Ed.2d 140 (2014) (same for Virginia); *Bishop v. Smith*, 760 F.3d 1070 (10th Cir.), *cert. denied,* —— U.S. ——, 135 S.Ct. 271, 190 L.Ed.2d 139 (2014) (same for Oklahoma).

7. 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972).

8. *Id.* at 810, 93 S.Ct. 37.

9. *Sosna v. Iowa*, 419 U.S. 393, 404, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975).

law [10]—should in fact be permitted to preserve, protect, and defend it. I would allow the attorney general to make his argument that Texas law imposes an absolute jurisdictional constraint and constitutionally prohibits a judge not only from performing a same-sex marriage but also from dissolving one.

The attorney general may be right. He may be wrong. But he should be heard.

I respectfully dissent.

## I. Background

In this case, a Massachusetts-married couple, Angelique Naylor and Sabina Daly, was initially split over splitting. Daly contested the divorce, and her answer to the divorce petition included a motion to dismiss and/or declare the marriage void. Her motion explained that the "Court does not have subject matter jurisdiction over this matter because Petitioner is asking the Court to recognize and enforce a marriage between two persons of the same sex which is contrary to the law and public policy of the State of Texas." Daly also argued that "the 'marriage' between Petitioner and Respondent is invalid ... and the parties do not qualify for a divorce." The State considered this the correct legal argument and, as a result, merely monitored the litigation rather than intervening right away.

The trial court doubted its own jurisdiction, repeatedly remarked on the "very important" constitutional issues, called the case "quite a legal mess," and fretted its jurisdiction could "only be resolved by constitutional analysis, none of which has been fully briefed." That briefing and constitutional analysis never happened. The next day, after learning the attorney general's office was observing the proceedings, Daly

abruptly scrapped her jurisdiction/voidance argument. She and Naylor promptly settled and asked the court to grant an agreed divorce decree, which the court announced from the bench. The State sought intervention the next day, before the court signed its judgment but after the court had verbally granted "an ostensible divorce." [11] The court did not allow intervention and did not rule on the State's plea to the jurisdiction. Acknowledging that "interesting constitutional issues" and "jurisdictional question[s]" existed, the court urged the State to take it up with the court of appeals—which ultimately held the State lacked any standing to appeal.

The parties' settlement agreement is interestingly worded. It acknowledges that same-sex divorce might be unavailable under Texas law and notes the parties requested a divorce decree "to the extent" the trial court had "the power to do so." The trial court's divorce decree is unique, too. While declaring the parties divorced and the marriage "dissolved," as did the settlement agreement, it concedes that the divorce "might not be legal in the State of Texas," and if so, the order "is intended to be a substitute for ... a valid and subsisting divorce of these parties." Similarly, the property-rights section of the decree purports to divide "any marital estate *that might exist*." (emphasis added). The State dismisses these lawyerly turns of phrase as a semantic ruse and contends the parties have supplanted our adversarial legal system with an "illegal agreed judgment" that flouts Texas law by enshrining an "unconstitutional divorce decree."

Are these parties lawfully divorced or not? Uncertainty abounds regarding a matter that demands—and deserves—certainty. Is their Massachusetts marriage intact, dissolved, or in some domestic-rela-

---

**10.** TEX. CONST. art. XVI, § 1.

**11.** *Ante,* at 786.

tions netherworld? They don't know. More than 3,200 Texas judicial officers don't know. Four hundred seventy-eight district and county clerks don't know. One hundred eighty-one members of the Legislature don't know. The attorney general doesn't know. The Governor doesn't know. Twenty-seven million Texans don't know. The Court says it cannot say. I would not allow such nagging uncertainty to cloud such a fundamental question.

Indecision breeds insecurity. If the attorney general is correct, then the trial court lacked subject-matter jurisdiction, meaning the divorce decree in this case is void and forever vulnerable to collateral attack at any time (unless the Texas Constitution and Family Code are themselves unconstitutional).[12] Is the State of Texas so procedurally powerless to defend Texas laws against perceived, implicit constitutional attack that even jurisdictionally barred (and thus void) rulings can escape appellate scrutiny?

The Court does not confront the attorney general's core argument: Texas courts cannot grant same-sex divorces without judicially invalidating Texas law. The issue is present but cannot be presented. I believe prudent equitable considerations weigh in favor of hearing from the State.

## II. Discussion

The Court is correct that intervention after judgment is disfavored.[13] "There is no deadline for intervention,"[14] however, and our law makes room for case-by-case exceptions. Years ago, a trial judge in Beaumont vacated a same-sex divorce decree after the attorney general intervened post-judgment to assert the lack of subject-matter jurisdiction.[15] Just last year, this Court upheld *sub silentio* the State's post-judgment intervention in a private suit in order to assert that a proposed *cy pres* award in a class-action settlement violated the Unclaimed Property Act (UPA).[16] We ultimately rejected the attorney general's view that the UPA applied, but we considered his post-judgment intervention wholly unremarkable, never doubting his justiciable interest in ensuring that state law was defended.[17]

12. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex.1993) ("Subject matter jurisdiction is an issue that may be raised for the first time on appeal; it may not be waived by the parties.").

13. *Ante*, at 787. "Ordinarily, a trial court does not abuse its discretion by denying a motion to intervene after the court has rendered a final judgment." *In re Lumbermens Mut. Cas. Co.*, 184 S.W.3d 718, 725 (Tex.2006) (*Lumbermens I*).

14. *Tex. Mut. Ins. Co. v. Ledbetter*, 251 S.W.3d 31, 36 (Tex.2008).

15. *See* Melissa Drosjack, *Gay couple won't get Texas divorce*, Houston Chronicle (March 29, 2003).

16. *Highland Homes v. State*, 448 S.W.3d 403, 408 (Tex.2014).

17. Ultimately, the Court held that "the State's argument for the application of the [UPA]

cannot succeed unless class representatives' authority to act for class members under Rule 42 is disregarded." *Id.* at 412. Having implicitly approved of the trial court's determination "that Plaintiffs and Class Counsel ... have adequately represented the interests of the Settlement Class," *id.* at 408, it would have been a simple matter for the Court to hold that there was no interest for the attorney general to represent, leaving him without a justiciable interest to represent and leaving the Court without jurisdiction over questions arising from his intervention.

Moreover, despite ultimately holding the UPA inapplicable, we did not treat the appropriateness of intervention as turning upon whether the parties had squarely litigated the UPA's applicability. In addition, although the parties took it upon themselves to notify the attorney general of the proposed *cy pres* award, *id.* at 408, it escapes me how notifying the attorney general of a suit could provide

Here, there looms a fundamental, threshold issue–whether Texas courts even have *jurisdiction* in same-sex divorce proceedings—an issue that couples seeking dissolution have an understandable desire to minimize. The State adamantly insists that granting a same-sex divorce necessarily means declaring state law unconstitutional, which, if true, means void judgments forever vulnerable to challenge: "There is no finality in a void decree issued without jurisdiction." As the trial court admitted—openly, candidly, and repeatedly—significant issues permeate this case, and they deserve genuine adversarial presentation and painstaking judicial review.

## A. The virtual-representation doctrine, as historically articulated, may not apply, but a formulation amenable to threshold jurisdictional arguments might.

As the Court notes, the rule disfavoring post-judgment intervention is sometimes relaxed under the virtual-representation doctrine.[18] This is an equitable doctrine to be applied flexibly—not "a crisp rule with sharp corners" but one that "must be determined on a case-by-case basis."[19] For example, we have allowed a subrogee to intervene post-judgment when the subrogee's interest was "adequately represented and then suddenly abandoned by someone else."[20] We have stressed the "novel pos-

ture," "unique facts," and "unusual circumstances" of a case to grant mandamus relief so an insurer could intervene on appeal to raise an issue its insured had abandoned.[21] In *Motor Vehicle Board v. El Paso Independent Automobile Dealers Ass'n*,[22] local officials initially defended the constitutionality of a state statute.[23] The attorney general was aware of the lawsuit but chose not to intervene because one party was already making the proper arguments.[24] When the party abruptly abandoned its defense of the statute and agreed to a settlement invalidating it, the State intervened, and we permitted the State's appeal.[25]

The Court points mainly to the court of appeals' explanation as to why virtual representation is a tough sell. The State itself concedes this dispute is "not a prototypical virtual-representation case." Nonetheless, it argues virtual representation is warranted, as we have stated, "in order to vindicate important rights,"[26] such as when parties displace our adversarial system with a "legally baseless agreed judgment" that subverts the State's inherent right to defend Texas law against constitutional attacks. The State notes that our decisions, which are mindful of the virtual-representation doctrine's equitable roots, have focused on a case's unique posture and novel circumstances when allowing tardy intervention.

him with a justiciable interest he otherwise would have lacked.

18. See *Lumbermens I*, 184 S.W.3d at 726 ("While other equitable factors may weigh against allowing a virtually-represented party to invoke appellate rights, the mere fact that the party does not attempt to invoke those rights until after judgment, when the need to invoke them arose, is not dispositive.").

19. *Id.* at 725 (internal quotation marks omitted).

20. *Ledbetter*, 251 S.W.3d at 36.

21. *Lumbermens I*, 184 S.W.3d at 720, 726–27.

22. 1 S.W.3d 108 (Tex.1999).

23. *Id.* at 110.

24. *See id.*

25. *Id.* at 110–11.

26. *Lumbermens I*, 184 S.W.3d at 723.

That said, and as the State acknowledges, this case "does not map perfectly onto the virtual-representation doctrine." I do not disagree it is a stretch under our historic articulation of the doctrine. Other jurisdictions' formulations seem better suited to this uncommon context, where core issues of subject-matter jurisdiction, resulting void judgments, and state-law constitutionality are present but apt to elude review given the understandable desire of non-adversarial parties to play things down.[27] Perhaps one sensible, limiting consideration in this context—where the trial court itself voices doubts regarding subject-matter jurisdiction and constitutionality—should be whether the "virtually represented" party, here the State of Texas, had a meaningful opportunity to intervene following the abrupt abandonment of its jurisdictional argument.

But putting aside virtual representation and whether to allow some exceedingly narrow variant on these unique facts, I believe numerous equitable considerations weigh in favor of the State's right to speak when the constitutionality of its laws is questioned, however obliquely, particularly when done so through artfully worded judgments that at once underscore and undermine appellate scrutiny of vital issues of jurisdiction and constitutionality.

## B. Prudent equitable principles support the State's intervention argument.

The Court says the State lacks standing to intervene on appeal, a prerequisite to our jurisdiction. The State says the jurisdictional defect is far more fundamental: Texas courts lack jurisdiction over same-sex divorces entirely.

This is a controversial case—undeniably—but that is not the reason the State deserves the right to be heard. The issue is less subject matter than subject-matter jurisdiction. The attorney general insists that Texas courts have no judicial power to dissolve a same-sex marriage (the precise position Daly initially argued and that the trial court openly worried about). The Court today does not address this question, saying the attorney general waited

27. For example, in the Second Circuit, "a nonparty may appeal when the nonparty has an interest *that is affected* by the trial court's judgment," not just when the nonparty can show he is legally *bound* by the judgment. *See United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., AFL–CIO*, 931 F.2d 177, 183 (2d Cir. 1991) (emphasis added) (internal quotation marks omitted). That less-rigid articulation seems a more sensible fit where the attorney general's underlying rationale for intervention is the judicial branch's utter lack of subject-matter jurisdiction.

The Court today emphasizes, "the State is not bound by the disputed divorce decree." *Ante*, at 789. The State fully agrees, but not because it concedes a lack of involvement—or lack of stake—in the proceedings. Rather, it "is not bound by the district court's void divorce decree—and neither are Respondents or anyone else, as a void judgment issued without jurisdiction can never be enforced."

If this legal position is sufficient to defeat application of the virtual-representation doctrine, then no party could ever be virtually represented in a proceeding in which the trial court lacked subject-matter jurisdiction. The very reason the State concedes it is not bound—indeed, why *nobody* is—is because it is impossible for anyone to be bound by a void judgment issued by a jurisdiction-less court.

The State is speaking an entirely different legal vocabulary. While not *bound* it is certainly *constrained*, powerless to uphold laws that will be steadily stiff-armed (as the State sees it) until it timely discovers a proceeding in a court willing to entertain its jurisdictional arguments. As for identity of interest, the State's interest here is plainly put—the enforcement and constitutionality of Texas law—but it's difficult to have identity of interest about enforcement and constitutionality with litigants who want no talk of enforcement and constitutionality.

too long to raise it. But if the attorney general is right, then this couple is not divorced, and the trial court's decree can be collaterally attacked for as long as they both shall live. The State of Texas and these parties deserve a definitive, once-and-for-all ruling on whether state judges possess the authority to grant same-sex divorces. The State's ability to raise the issue should not turn on its ability to monitor divorce filings in every clerk's office in the State in order to intervene promptly.

At the same time, it is precisely the notoriety of the underlying issue, and the attorney general's demonstrated record of engagement, that might spur litigants to wire around intervention. Recently, a state judge in Travis County quietly signed an order barring enforcement of Texas's traditional marriage laws.[28] I use the word "quietly" because the court elected not to advise the attorney general of any constitutional question, thus depriving the State's chief legal officer of his statutorily mandated opportunity to defend Texas law.[29] Moreover, the constitutional validity of Texas marriage law was pending in this Court. A similar thing happened in

San Antonio last year,[30] all in the face of Texas law that requires notice and forbids state courts from declaring a statute unconstitutional before the 45th day after notice is served on the attorney general.[31]

I understand that in certain proceedings everyone in the courtroom—litigants, counsel, and judges alike—may prefer no involvement by the attorney general. But Texas law *commands* involvement by the attorney general, no matter how righteous or urgent the cause is thought to be. That's precisely the point of the notice law. The Legislature has determined that state law is entitled to a vigorous defense. The attorney general isn't omnipresent, able to monitor every filing in every courthouse across 254 counties. The tension is between what the parties logically want (their case off the radar) and what Texas legally requires (their case on the radar). The notice law recognizes, and forthrightly aims to thwart, the desire to engage in procedural corner-cutting to avoid unwanted attention.

The legal airtightness of a same-sex couple's divorce cannot hang on a reed so thin

---

**28.** The judge issued a temporary restraining order enjoining the county clerk from "relying on the unconstitutional Texas prohibitions against same-sex marriage as a basis for not issuing a marriage license to" a specific couple. *Goodfriend v. Debeauvoir*, No. D–1–GN–15–000632, 2015 WL 691088 (Travis Cnty. Dist. Ct. Feb. 19, 2015).

**29.** *See* Tex. Gov't Code § 402.010(a) ("The court shall, if the attorney general is not a party to or counsel involved in the litigation, serve notice of the constitutional challenge and a copy of the petition, motion, or other pleading that raises the challenge on the attorney general...."). Even if the attorney general *had* received such notice, however, it likely would have been difficult to mount any defense of constitutionality in the time that elapsed between the trial court's order allowing the plaintiffs to file their initial pleadings in paper form—marked as 8:51 a.m. on Feb-

ruary 19, 2015—and the trial court's subsequent order finding that the "unconstitutional statutory and state constitutional prohibitions in Texas against same-sex marriage" were causing the plaintiffs immediate and irreparable damage—marked as 8:52 a.m. on February 19, 2015.

**30.** *In re State*, No. 04–14–00282–CV, 2014 WL 2443910, at \*4 (Tex.App.–San Antonio May 28, 2014, orig. proceeding) (holding the trial court abused its discretion when it declared Texas marriage law unconstitutional without first notifying the attorney general of the constitutional challenge).

**31.** *See* Tex. Gov't Code § 402.010(b) ("A court may not enter a final judgment holding a statute of this state unconstitutional before the 45th day after the date notice required by Subsection (a) is served on the attorney general.").

and fortuitous as whether the attorney general got wind of the case and was timely heard by the court. His awareness is irrelevant to the core issue: whether the dissolution implicates and invalidates Texas law. Can a court dissolve a marriage, same-sex or otherwise, without first recognizing and validating the marriage? A couple may adamantly dispute whether they are disputing constitutionality. That is likewise irrelevant to the core issue: whether the dissolution implicates and invalidates Texas law. Again, if the attorney general is correct that Texas courts lack jurisdiction, then this "divorce" is void and forever challengeable. Even those with polar opposite views on the constitutionality of same-sex marriage must agree: That sort of legal purgatory benefits nobody.

On matters of this consequence, when there is such hard-wired incentive for artful pleading, semantic gamesmanship, and tactical shortcuts in order to evade adversarial presentation and judicial review of momentous jurisdictional and constitutional issues, I would banish all uncertainty. Does Texas law allow same-sex couples to divorce or not? And if not, does that violate the United States Constitution? Let us decide once and for all and be done with it.

### 1. Subject-matter jurisdiction is always front and center and must always be confirmed.

"Subject matter jurisdiction is never presumed and cannot be waived."[32] No jurisdiction equals no judicial power,

meaning courts always have an affirmative duty to confirm jurisdiction exists. A court without jurisdiction has power to do only one thing: dismiss.[33] Conversely, any action other than dismissal necessitates an inference that the court believed its action properly surmounted any jurisdictional obstacles. Given the judiciary's *sua sponte* duty to ensure subject-matter jurisdiction, a party's pleadings will *always* place jurisdictional requisites at issue.

In a same-sex divorce action, even if no party points to the Family Code or to the Texas Constitution as posing jurisdictional hurdles (or notes the attendant federal constitutional implications), courts must independently confirm their own jurisdiction, including awareness that Texas law might have something to say about the matter— and that the federal Constitution could be implicated, too. By granting a same-sex divorce, a Texas trial court implicitly holds it has subject-matter jurisdiction, either because the Family Code and Texas Constitution do not bar jurisdiction, or because any putative jurisdictional bars are unconstitutional under the federal Constitution. The trial court here, having bluntly fretted about the "interesting constitutional issues" and "jurisdictional question[s]," knew its ruling was implicating serious matters.

### 2. Limits on subject-matter jurisdiction merit genuine adversarial presentation.

A legislature's ability to limit courts' subject-matter jurisdiction helps disaggregate power among the three branches, but once established, the power to enforce ju-

---

**32.** *Tex. Ass'n of Bus.*, 852 S.W.2d at 443–44. *See Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 379 (Tex.2006) ("Subject-matter jurisdiction cannot be waived or conferred by agreement [and] must be considered by a court *sua sponte....*"). *See also Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex.2004) ("The trial court must deter-

mine at its earliest opportunity whether it has the constitutional or statutory authority to decide the case before allowing the litigation to proceed.").

**33.** *City of DeSoto v. White*, 288 S.W.3d 389, 393 (Tex.2009).

risdictional limits transfers entirely to the judiciary itself. Judges, in a sense, judge themselves, having final say on how the jurisdictional limitations placed upon them are construed.

Typically, adversarial presentation by opposing parties helps mollify this concern. But where the parties are not oppositional, and given the courts' jurisdictional self-policing, we have reason to be watchful. This case is illustrative. Parties seeking a hassle-free, no-fault divorce have zero incentive to challenge the trial court's subject-matter jurisdiction. Here, although Daly initially disputed the trial court's jurisdiction, she later abandoned that view, and the parties swiftly bridged their differences.[34]

As noted above, jurisdiction is an omnipresent issue, and where no party challenges it, and has no incentive to, courts must still address it. Thus, one irony of jurisdictional issues is their persistence in the absence of adversarial presentation.

In my view, a court inclined to restraint should receive—not grudgingly but gratefully—arguments from the attorney general on alleged bars to the court's jurisdiction, particularly when the nature of the proceedings removes any expectation the parties themselves will speak up. The intervention of the attorney general does not imperil the independence of the judiciary to adjudicate disputes, but it does ensure the virtuous check of adversarial presentation where there would otherwise be none.

### 3. *In*direct constitutional attacks deserve zealous attorney general advocacy, too.

I am confident the Court agrees the attorney general may intervene in private litigation when a party *directly* attacks a law's constitutionality. The Legislature presumes the same, indeed *promotes* it, requiring notice to the attorney general at least 45 days before judgment in order to give the State the opportunity to intervene.[35] All three branches of government agree: The attorney general gets to intervene when a party launches a direct constitutional attack on Texas law. But what if the attorney general is convinced Texas law is being *implicitly* attacked, not overtly but covertly? In other words, the trial court cannot grant the relief requested without first implicitly holding an alleged jurisdictional limitation unconstitutional? (I wonder if the Court would allow *post-judgment* intervention had the trial court *explicitly* declared state law unconstitutional.)

I see no meaningful, nonartificial distinction between a direct constitutional challenge and this case. Here, the risk that section 6.204(a) of the Family Code or Article I, section 32(a) of the Texas Constitution will be declared unconstitutional is present even if neither party to the divorce expressly attacks those laws. Parties may not realize Texas law might bar the proceeding. That's precisely why courts have an independent, *sua sponte* duty to confirm jurisdiction exists. Here, Daly actually raised jurisdiction, initially arguing the trial court had none, and the trial court itself candidly spoke of the significant jurisdictional and constitutional uncertainties.

Here, the trial court necessarily, if tacitly, weighed in on the application of section

---

34. The pleadings suggest Daly abandoned her jurisdiction argument and the parties resolved their property dispute after they became aware the attorney general was monitoring the courtroom proceedings.

35. Tex. Gov't Code § 402.010(a)–(b).

6.204. In order to determine it had subject-matter jurisdiction, the court had to hold section 6.204 either inapplicable or invalid. If inapplicable, it would have been unnecessary to reach validity.[36] On the other hand, if the trial court determined that section 6.204 applies to divorces, it *must* have also determined the section was invalid in order to grant relief.[37]

Even *absent* State intervention, however, a trial court could well realize on its own, as this one did, that jurisdictional issues were at play, and then proceed to declare Texas law unconstitutional, without the State ever uttering a peep in defense. Just as a raised constitutional issue may be unaddressed, an unraised constitutional issue may be addressed, particularly where such a determination relates to the boundaries of the court's own power. Laws can be invalidated whether or not litigants flag constitutionality. So why would attorney general intervention be appropriate only when a party *expressly* attacks Texas law? Express or implicit, direct or indirect—indeed, raised or unraised—Texas law is potentially imperiled.

If the chief legal officer of Texas, sworn to "preserve, protect, and defend" the Constitution and laws of Texas,[38] is convinced that a court is being urged, albeit quietly, to strike something down, State law deserves the State's lawyer. Here, constitutionality was clearly in play; it was not a mere fanciful concern. Daly herself asserted that Texas law barred same-sex marriage, which raises federal constitutional questions, and the trial court forthrightly noted the weighty constitutional and jurisdictional issues at stake.[39]

### 4. The parties seek a divorce declaration that necessarily presumes a valid marriage.

Daly and Naylor asked the trial court to deploy the judicial resources of the State of Texas to effect their dissolution. Specifically, they sought a legal benefit in the form of a legally valid and enforceable divorce decree dividing their assets. In doing so, they asked for something the State's chief lawyer insists the court had no authority to give, at least not without tacitly ruling Texas law unconstitutional.

Texas law forbids giving effect to something that "creates, recognizes, or validates" same-sex marriage.[40] Is dissolving a marriage recognized elsewhere recognizing the marriage here? Is dissolving a valid marriage validating the marriage? The parties disagreed initially but now both say no—their divorce petition, while alleging a valid marriage, does not ask

**36.** *See In re B.L.D.*, 113 S.W.3d 340, 349 (Tex.2003) ("As a rule, we only decide constitutional questions when we cannot resolve issues on nonconstitutional grounds."); *In re Doe 2*, 19 S.W.3d 278, 284 (Tex.2000) ("We have previously cautioned that the constitutionality of a statute should be considered only when the question is properly raised and such determination is necessary and appropriate to a decision in the case.").

**37.** By conflating the preference for resolving interpretive choices in favor of constitutionality with the preference for resolving cases without any reference to the Constitution, the court of appeals' opinion presents an erroneous inversion of this determinative order.

The court of appeals suggests that because the trial court would have to reach the question of section 6.204's validity unless the section is inapplicable, the court *must* hold that section 6.204 is inapplicable. *See* 330 S.W.3d 434, 441–42.

**38.** TEX. CONST. art. XVI, § 1.

**39.** Even if the State is mistaken that jurisdiction must necessarily be addressed in order to grant a same-sex divorce, the incorrectness of that view does not mean the State lacks standing to make the argument.

**40.** TEX. FAM. CODE § 6.204(c)(1).

Texas to recognize or validate it. Maybe. The attorney general emphatically says yes—a Texas court cannot undo what it could not itself do. Maybe. The rub is this: If the attorney general's reading of Texas law is correct, the divorce is void and forever vulnerable to collateral attack (unless Texas law is itself unconstitutional).

In the most practical sense, Daly and Naylor sought a formal declaration, however connotative, of the application and validity of Texas's traditional marriage laws. The trial court openly wrestled with all these issues—questioning its own jurisdiction, describing the case as "quite a legal mess," noting the "interesting constitutional issues," and requesting more briefing, before abruptly shifting gears the next day.

As noted above, section 402.010 of the Government Code states that when a party challenges the constitutionality of a state statute, the court must serve notice on the attorney general and may not enter final judgment for 45 days following the date of notice. Although the Legislature enacted section 402.010 after the trial court took action in this case,[41] section 402.010 conferred notice, not standing, on the attorney general.[42] His standing to defend statutory and constitutional enactments against constitutional attack *preexisted* section 402.010.[43]

Here, Naylor sought a legally enforceable divorce decree that, according to the attorney general—and with whom Daly initially agreed—was only available if the trial court declared Texas's jurisdictional limitation unconstitutional. While the divorce petition did not expressly seek such a declaration, I would hold that a party cannot circumvent a constitutional issue necessarily, if obliquely, presented—as well as the right of the attorney general to be heard on the matter—by neglecting to mention the issue in his pleading. To hold otherwise would allow litigants to obtain relief the Legislature has prohibited, relief that is available only if the trial court invalidates the prohibition as unconstitutional.

Litigants should not be able to camouflage constitutional questions through artful pleading. State law is sensibly designed to facilitate intervention by the attorney general where the trial court might possibly declare Texas law unconstitutional, and the parties (and the court) are all too happy to leave the law unmentioned—and undefended.

## 5. Parties should not be incentivized to circumvent jurisdictional limits by agreement or artful pleading.

In my view, when (1) the nature of the proceedings suggests the parties lack ad-

---

41. Act of May 24, 2011, 82d Leg., R.S., ch. 808, § 1, 2011 Tex. Gen. Laws 1873.

42. *Cf.* Tex Gov't Code § 402.010(c) ("A party's failure to file as required ... or a court's failure to serve notice as required ... does not deprive the court of jurisdiction or forfeit an otherwise timely filed claim or defense based on the challenge to the constitutionality of a statute of this state.").

43. Section 37.006(a) of the Civil Practice and Remedies Code imposes a similar notice requirement in the declaratory-judgment context: "When declaratory relief is sought, all persons who have or claim any interest that would be affected by the declaration must be made parties." Tex. Civ. Prac. & Rem. Code § 37.006(a). Section 37.006(b) then makes clear, if it were not already so, that the State has a sufficient interest to be made a party in a case where the original plaintiff seeks a holding that a state statute is unconstitutional: "In any proceeding ... if the statute ... is alleged to be unconstitutional, the attorney general of the state must be served with a copy of the proceeding and is entitled to be heard." *Id.* § 37.006(b).

verse interests regarding the existence of jurisdiction,[44] and (2) the attorney general believes jurisdiction cannot exist without disregarding and implicitly invalidating Texas law, the attorney general should be allowed to intervene, even one day late, to assert and defend the jurisdictional restriction. This formulation is consistent with courts' treatment of the justiciability of the attorney general's interest in other contexts.

By way of illustration, the Property Code affirmatively recognizes the attorney general's authority to "intervene in a proceeding involving a charitable trust,"[45] but that justiciable interest turns on whether the trust is a charitable one. Although a finding that the trust has a charitable purpose is often implied rather than contested,[46] surely trial courts are not permitted to strike an intervention merely because the court *could* determine that a trust is private rather than charitable. Indeed, this Court last year in *Highland Homes* did not disapprove of the attorney general's post-judgment intervention or retrospectively disapprove of the justiciability of his interest, despite rejecting his argument that the UPA applied—even though pre-

sumably the justiciability of the attorney general's interest was contingent upon the presence of unclaimed property.

Nor should parties be permitted to cut off the attorney general's interest before he is able to assert it merely by stipulating that a trust is not a charitable one, or that a settlement does not involve unclaimed property, or by neglecting to affirmatively flag such issues altogether. Such furtiveness would deprive the attorney general of the opportunity to appeal the threshold determination on which his interest is anchored.[47] And it impedes fulfillment of his solemn duty to represent the State and defend Texas law, thus (1) aggrandizing judicial power at the expense of the other branches, and (2) elevating private parties above the electorate whose will was expressed indirectly in our statutes and directly in our Constitution.

Finally, denying the State's intervention in such a suit excludes the only party with an incentive to challenge subject-matter jurisdiction, thus underscoring the structural necessity of his presence to ensure sober jurisdictional review—a review this

---

**44.** Similarly, the defendant and collecting class members' lack of a stake in protecting the missing class members' property interests in the settlement agreement was a background concern in *Highland Homes*. *See* 391 S.W.2d 415, 417 (Tex.Crim.App.1965) (Devine, J., dissenting) ("The missing parties' property rights can only be preserved if the State is permitted to act as their custodian under the UPA."); *id.* at 418 (noting that the chosen *cy pres* recipient shared the defendant's interests but had no demonstrable connection to the interests of the class members). Aside from protecting the missing class members' property interests, the attorney general's presence was essential to adversarial presentation of an issue that the parties had no reason to raise except to insulate their judgment from a later collateral attack.

**45.** Tex. Prop. Code § 123.002.

**46.** *But see Allred v. Beggs*, 125 Tex. 584, 84 S.W.2d 223, 228 (1935) (rejecting the error brought by the attorney general on appeal because "[w]hen we come to construe this will from its four corners, it becomes evident that it is not a donation to public charity only . . ."); *In re Estate of York*, 951 S.W.2d 122, 125 (Tex.App.–Corpus Christi 1997, no writ) ("We must then determine whether that estate involves the present charitable trust such that the Attorney General may intervene on its behalf."); *Gen. Ass'n of Davidian Seventh Day Adventists, Inc. v. Gen. Ass'n of Davidian Seventh Day Adventists*, 410 S.W.2d 256, 260 (Tex.Civ.App.–Waco 1966, writ ref'd n.r.e.) (rejecting complaint that the attorney general's presence was required in the suit because the trust was not a charitable trust).

**47.** *But see Allred*, 84 S.W.2d at 227.

Court has previously found compelling enough to permit unpreserved challenges on appeal.[48]

## C. Alternatively, the Court should grant the State's petition for writ of mandamus in order to allow the attorney general to be heard on subject-matter jurisdiction.

I also disagree with the Court's refusal to consider the State's mandamus petition as a means of addressing the State's arguments regarding the trial court's subject-matter jurisdiction. As we stated in *Terrazas v. Ramirez*,[49] one "need not be a party to the underlying litigation in order to seek mandamus relief."[50] If the State is correct that the trial court lacked subject-matter jurisdiction to render a divorce decree, then the judgment is void and subject to collateral attack.[51]

Although a petition that is originally filed in the Supreme Court must "state a

compelling reason why the petition was not first presented to the court of appeals,"[52] "[r]equest and refusal have not been required for mandamus relief in every case."[53] Thus, we have "expressly excused [the] requirement when the request would have been futile and refusal little more than a formality."[54] Yet the Court still faults the State for failing to state sufficiently compelling reasons why its petition was not first presented to the court of appeals.[55]

In rejecting the State's proffered explanations, the Court relies on our per curiam denial of the petition for writ of mandamus in *In re Lumbermens Mutual Casualty Co.*[56] However, that denial was in light of our disposition in a related but separate opinion in which we held that the court of appeals had abused its discretion in denying the petitioner leave to participate in the appeal.[57] In contrast, here, the State

---

**48.** As we observed in *Texas Association of Businesses v. Texas Air Control Board*:

> If we were to conclude that standing is unreviewable on appeal at least three undesirable consequences could result. First and foremost, appellate courts would be impotent to prevent lower courts from exceeding their constitutional and statutory limits of authority. Second, appellate courts could not arrest collusive suits. Third, by operation of the doctrines of res judicata and collateral estoppel, judgments rendered in suits addressing only hypothetical injuries could bar relitigation of issues by a litigant who eventually suffers an actual injury.

852 S.W.2d at 445.

**49.** 829 S.W.2d 712 (Tex.1991).

**50.** *Id.* at 723.

**51.** *See Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 863 (Tex.2010) ("A void order is subject to collateral attack in a new lawsuit, while a voidable order must be corrected by direct attack; unless successfully attacked, a voidable judgment becomes final."); *see also Sanchez v. Hester*, 911 S.W.2d 173, 176 (Tex.

App.–Corpus Christi 1995, orig. proceeding) ("Voidable orders are readily appealable and must be attacked directly, but void orders may be circumvented by collateral attack or remedied by mandamus." (citing *Mapco, Inc. v. Forrest*, 795 S.W.2d 700, 703 (Tex.1990) (orig. proceeding))).

**52.** *See* Tex. R. App. P. 52.3(e).

**53.** *Terrazas*, 829 S.W.2d at 724.

**54.** *Id.* at 723.

**55.** *Ante*, at 794–95. *But see Terrazas*, 829 S.W.2d at 725 ("Although relators might have moved to set aside the judgment in *Quiroz* even after it was rendered, we do not view this as a prerequisite to mandamus in this proceeding.").

**56.** 184 S.W.3d 729, 730 (Tex.2006) (*Lumbermens II* ).

**57.** *Id.* ("In light of this disposition, we deny Lumbermens' petition for writ of mandamus without regard to the merits and without prejudice to Lumbermens' ability to seek relief from the trial court or the court of appeals.").

will not have an opportunity to participate in further proceedings, and a denial of its petition for writ of mandamus will not be "without prejudice to [its] ability to seek relief from the trial court or the court of appeals." [58]

Although the Court now refuses to consider an "unreviewed mandamus argument," [59] it is clear that the substance of the State's arguments regarding the trial court's subject-matter jurisdiction were presented to the court of appeals. [60] Thus, the record does not lack for "a request for such performance by the party at interest and a refusal to perform on the part of the court." [61] The court of appeals reviewed the State's arguments that the parties had made an implied constitutional attack [62]— albeit under the assumption that the State brought a direct rather than collateral attack. But so long as the same jurisdictional grounds provide the basis for the court of appeals' decision in either determination, there is no real significance to a distinction between a dismissal of an appeal and a denial of a petition for writ of mandamus in the court of appeals. Such a distinction is solely one of form. [63]

However, because the State purported to file an appeal rather than an original proceeding in the court of appeals, the Court has chosen to ignore the substance of the State's arguments entirely. [64] As a matter of judicial economy, [65] I would instead focus on whether the arguments that the State presented to the court of appeals would entitle the State to mandamus relief and thereby squarely address the justiciability of the State's interest.

## III. Conclusion

It is not uncommon for litigants in our adversarial system to talk past each other and frame cases in polar opposite ways. Daly and Naylor, initially at odds over jurisdiction and constitutionality, now describe this case as a purely private matter. The State of Texas contends legitimate public concerns are at stake. Does Texas law constitutionally deprive state courts of jurisdiction in same-sex divorce cases? The State says yes; the parties say no;

58. *Id.; see also Williams v. Huntress*, 153 Tex. 443, 272 S.W.2d 87, 89 (1954) ("This would not be subject to original attack here and within our jurisdiction if relator had an opportunity to correct an error of the trial court by normal appellate procedure.").

59. *Ante*, at 794.

60. *See* 330 S.W.3d at 435 ("The State appeals from the final divorce decree of appellees Angelique Naylor and Sabina Daly, asserting that section 6.204 of the family code deprives the trial court of subject-matter jurisdiction.").

61. *See Hursey v. Bond*, 141 Tex. 337, 172 S.W.2d 305, 306 (1943).

62. 330 S.W.3d at 441 ("The State treats Naylor's petition for divorce as an 'implied' constitutional attack on section 6.204 of the family code....").

63. *Cf. Terrazas*, 829 S.W.2d at 724 (noting that we have excused the requirement that a litigant request mandamus relief in the court of appeals when the request would be "little more than a formality").

64. *But see Mueller v. Saravia*, 826 S.W.2d 608, 609 (Tex.1992) (reaffirming the policy that appellate courts should resolve cases on substantive grounds rather than procedural technicalities); *Crown Life Ins. Co. v. Estate of Gonzalez*, 820 S.W.2d 121, 121–22 (Tex.1991) ("[A]ppellant should be given opportunity to have disposition on the merits unless such causes violence to the rules.").

65. *See,. e.g., Clay Exploration, Inc. v. Santa Rosa Operating, LLC*, 442 S.W.3d 795, 802–03 (Tex.App.– Houston [14th Dist.] 2014, no pet.) (providing examples of circumstances under which judicial economy may trump general rules regarding which issues a court may address).

the Court does not say. But nobody knows for sure. Has Texas law been judicially invalidated *sub silentio*? The State says yes; the parties say no; the Court does not say. But nobody knows for sure.

I would permit the State to intervene and lodge statutory and constitutional objections to a court's subject-matter jurisdiction, the exercise of which arguably necessitates treating—if not implicitly holding—Texas law as unconstitutional. Here, the State contends the issue of constitutionality is necessarily baked into a same-sex divorce proceeding. The State of Texas has an inherent justiciable interest in defending the constitutionality of its democratically enacted laws and is unquestionably injured when those laws are judicially, if inaudibly, invalidated.

Within days, the U.S. Supreme Court may well constitutionalize a 50–state right to same-sex marriage, and if so, the merits of *that* case (who can marry) will likely subsume the merits of *this* case (who can divorce). But regardless of the vital substantive issue at stake, there are vital standing—intervention—jurisdiction issues, too. The federal constitutional merits lurking in today's case will be addressed within days. But this case also raises significant Texas-specific issues vis-à-vis the State's chief legal officer, and this Court has final say over those. The Court says late is late, and the attorney general cannot tardily assert that the trial court lacked jurisdiction and tacitly declared Texas law unconstitutional. Today's bottom line: This Court lacks jurisdiction to decide if state courts lack jurisdiction.

In my view, the attorney general—constitutionally bound to "represent the State in all suits" [66]—has an interest sufficient to intervene to defend Texas law against perceived constitutional attack. His arguments may not prevail, but he should be allowed to make them.

I respectfully dissent.

Justice Devine, dissenting.

I fully join JUSTICE WILLETT's dissent and agree that the State could intervene. But resolving this case, which concerns a trial court's grant of a divorce to a same-sex couple, requires reaching additional issues. Texas law recognizes only traditional, heterosexual marriages, and I would hold that it divests state courts of subject-matter jurisdiction over same-sex divorce proceedings. The traditional concept of marriage, which the State intervened to protect, does not violate the United States Constitution. Though this issue is pending before the Supreme Court of the United States,[1] I here present my own opinion, for the issue is one that must be reached to dispose of the case.

## I. What is Marriage, and Divorce, in Texas?

Angelique Naylor and Sabina Daly, who obtained a marriage license under Massachusetts law, were granted a divorce by a Texas trial court. Only a party to a valid marriage may seek a divorce in Texas. *See* TEX. FAM. CODE §§ 6.001–.008 (pertaining to divorce). In other words, to obtain a divorce, parties must first be married. Under the Texas Constitution, "marriage" "consist[s] only of the union of one man and one woman." TEX. CONST. art. I, § 32(a). The Texas Constitution further prohibits the state from "creat[ing] or recogniz[ing] any legal status identical or similar to marriage." TEX. CONST. art. I, § 32(b). The Family Code also makes same-sex marriages void in Texas and pro-

---

**66.** TEX. CONST. art. IV, § 22.

**1.** *See Obergefell v. Hodges*, No. 14–556 (U.S. argued Apr. 28, 2015).

hibits the state or any political subdivision from recognizing or giving effect to any right or claim asserted as a result of such a marriage. TEX. FAM. CODE § 6.204(b)–(c). This does not leave the parties to an invalid marriage without recourse, for a party to an invalid marriage may have it declared void through an *in rem* proceeding. *See id.* § 6.307 (pertaining to void marriages).

Accordingly, Texas law prohibited the trial court from granting a divorce to Naylor and Daly, for Texas does not recognize them as married, and there can be no divorce without a marriage. What is more, this prohibition deprived the trial court of subject-matter jurisdiction over the divorce case.[2] Texas law prohibits the "state or an agency or political subdivision of the state" from "giv[ing] effect to a . . . public act, record, or judicial proceeding that creates, recognizes, or validates a marriage between persons of the same sex." TEX. FAM. CODE § 6.204(c)(1). And Texas law allows a court to grant a divorce only to married couples. In other words, the right of access to a divorce proceeding is based on being married. Otherwise, the very existence of the legal proceeding would give some effect to the same-sex marriage—a result forbidden by Texas

law. Where there is, by definition, no cognizable marriage under Texas law, there can be no jurisdiction to adjudicate a divorce proceeding.

In this case, the trial court overstepped the bounds of its jurisdiction under the Texas Constitution and state law when it granted a divorce to Naylor and Daly.

## II. Does the U.S. Constitution Allow Texas to Adhere to the Traditional Definition of Marriage (and Divorce)?

Naylor and Daly assert that this statutory and constitutional scheme is unconstitutional–that the United States Constitution requires Texas to grant divorces to same-sex couples married in other states. They assert that Texas law violates the Equal Protection Clause and the Due Process Clause, as well as the Full Faith and Credit Clause and the right to travel. I firmly believe that the state laws confirming Texas' commitment to traditional marriage do not violate the United States Constitution.[3]

### A. Due Process

The Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of

---

**2.** *See In re Marriage of J.B. & H.B.*, 326 S.W.3d 654, 670 (Tex.App.–Dallas 2010, pet. dism'd) ("Texas courts lack subject-matter jurisdiction to entertain a suit for divorce that is brought by a party to a same-sex marriage, even if the marriage was entered in another state that recognizes the validity of same-sex marriages."); *Mireles v. Mireles*, No. 01–08–00499–CV, 2009 WL 884815, at *2 (Tex.App.–Houston [1st Dist.] 2009, pet. denied) (mem. op.) ("A Texas court has no more power to issue a divorce decree for a same-sex marriage than it does to administer the estate of a living person.").

**3.** Even within the past year, some federal courts have concluded that the U.S. Constitution does not condemn the historical definition of marriage. *See DeBoer v. Snyder*, 772

F.3d 388 (6th Cir.2014), *cert. granted sub nom., Obergefell v. Hodges*, — U.S. —, 135 S.Ct. 1039, 190 L.Ed.2d 908 (2015); *Conde-Vidal v. Garcia–Padilla*, 54 F.Supp.3d 157 (D.P.R.2014); *Robicheaux v. Caldwell*, 2 F.Supp.3d 910 (E.D.La.2014). *But see, e.g., Latta v. Otter*, 771 F.3d 456 (9th Cir.2014), *petitions for cert. filed* (U.S. Dec. 30, 2014, Jan. 2, 2015, Apr. 9, 2015) (Nos. 14–765, 14–788, 14–1214); *Baskin v. Bogan*, 766 F.3d 648 (7th Cir.2014), *cert. denied*, 135 S.Ct. 316 (2014); *Bostic v. Schaefer*, 760 F.3d 352 (4th Cir.2014), *cert. denied*, — U.S. —, 135 S.Ct. 308, 190 L.Ed.2d 140 (2014); *Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir.2014), *cert. denied*, — U.S. —, 135 S.Ct. 265, 190 L.Ed.2d 138 (2014).

law." U.S. CONST. amend. XIV, § 1. This protection extends to claims for both substantive and procedural due process. The former protects certain unnamed fundamental rights, and the latter guarantees fair legal procedures before the state deprives a citizen of life, liberty, or property.

### 1. Substantive Due Process

The Due Process Clause has been held to protect certain fundamental rights, including the right to marry. *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). The United States Supreme Court has also recognized the importance of the right to divorce. In *Williams v. North Carolina*, the Court stated that divorce "touches basic interests of society." 325 U.S. 226, 230, 65 S.Ct. 1092, 89 L.Ed. 1577 (1945). In *Boddie v. Connecticut*, however, the Court made clear that it is the fundamental nature of *marriage* that makes divorce important. 401 U.S. 371, 374, 376, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). In other words, there is no stand-alone right to a divorce; the right to divorce is predicated on being married. Naylor and Daly have no right to a divorce unless they also have a right under the U.S. Constitution to be married.

Does the Due Process Clause require Texas to allow same-sex marriages? In 1967, the United States Supreme Court declared marriage to be a fundamental right. *Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). In *Loving*, the Court stated:

> The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men.
>
> Marriage is one of the "basic civil rights of man," fundamental to our very existence and survival.... Under our Constitution, the freedom to marry, or not marry, a person of another race resides with the individual and cannot be infringed by the State.

*Id.* But acknowledging this right does not answer the question—it begs it: *what is it to "marry"? (or to divorce?)* Does the Constitution prohibit Texas from limiting marriage to a man and a woman?

At this point, I pause to note what this case is not about. It does not concern state laws limiting access to marriage based on parties' personal characteristics that, under any proposed definition of marriage, are irrelevant to whether the marriage is actually a marriage. Contrast, for example, *Loving v. Virginia*, where the Supreme Court held that the Due Process Clause prohibited a state ban on interracial marriages. 388 U.S. at 12, 87 S.Ct. 1817.[4] But here, the issue is quite different: Texas does not restrict access to what has traditionally been viewed as a marriage (or as a divorce, for that matter). Rather, Texas has defined the very nature of marriage (and divorce) itself, establishing it as a union (or, for divorce, as a dissolution of a union) between a man and a woman. This case is also not like cases upholding the right to certain forms of sexual conduct. *See, e.g., Lawrence v. Texas*, 539 U.S. 558, 578, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) ("The present case ... does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter."). The Texas laws at issue merely define marriage (and divorce).

The U.S. Supreme Court, while striking down section 3 of the Defense of Marriage Act, expressly recognized that "[b]y histo-

---

**4.** As the Sixth Circuit explained, *"Loving* addressed, and rightly corrected, an unconstitutional eligibility requirement for marriage; it did not create a new definition of marriage." *DeBoer,* 772 F.3d at 411.

ry and tradition the definition and regulation of marriage ... has been treated as being within the authority and realm of the separate States." *United States v. Windsor,* —— U.S. ——, 133 S.Ct. 2675, 2689–90, 186 L.Ed.2d 808 (2013). States have almost exclusive authority to regulate domestic relations as long as they do not disregard constitutional rights. *Id.* at 2691. Notably, the Supreme Court's decision in *Windsor* was based not on a constitutional right to same-sex marriage, but on a conclusion that once states do authorize same-sex marriage, it is not the *federal* government's role to stand in the way. *See id.* at 2693 ("DOMA's unusual deviation from the usual tradition of recognizing and accepting state definitions of marriage here operates to deprive same-sex couples of the benefits and responsibilities that come with the federal recognition of their marriages."). Thus, it is within Texas' power to define marriage and divorce, unless doing so violates constitutional rights.

And I believe the Due Process Clause does not create such a fundamental right to same-sex marriage. "[E]xamining our Nation's history, legal traditions, and practices,"[5] the idea of same-sex marriage is relatively recent. Marriage between a man and a woman has long existed, and is indeed fundamental, but there is little precedent beyond the past few years for same-sex marriage. Where, as here, same-sex marriage is not rooted in our nation's history and tradition, and states have always had almost exclusive authority to define marriage, I cannot see that there would be a fundamental right to same-sex marriage.

Indeed, were there a fundamental right to marriage beyond its traditional, heterosexual bounds, the demands of strict scrutiny would upend many aspects of our marriage laws. Consider, for example, section 6.201 of the Family Code, which voids marriages between certain close relatives. The State's apparent interest is preventing the genetic consequences of inbreeding. But if the right to marriage is not limited to opposite-sex relationships which, at least in the abstract, are capable of procreation, would the State's interest in these consanguinity provisions apply to same-sex marriages? Or would these provisions fail (at least when applied to same-sex couples) for being overinclusive, not narrowly tailored? *See Reno v. Flores,* 507 U.S. 292, 305, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (stating that strict scrutiny requires narrow tailoring). What of provisions voiding marriages between a stepchild and stepparent? *See* TEX. FAM. CODE § 6.206. Even in a heterosexual relationship between an adult stepchild and stepparent, there is little risk of genetic harm to their offspring because of inbreeding. Surely this restriction too would fail if the right to marry exceeds the bounds of tradition.

In sum, I cannot conclude that a fundamental right to same-sex marriage exists. If the right to marry exceeds what is recognized by our history, legal traditions, and practices, then what are its limits? Surely this is a matter properly within the Legislature's discretion. Accordingly, I would apply rational basis review to the Texas laws limiting marriage to one man and one woman. This is discussed below following the Equal Protection analysis.

---

5. *Glucksberg,* 521 U.S. at 710, 117 S.Ct. 2258; *Malagon de Fuentes v. Gonzales,* 462 F.3d 498, 505 (5th Cir.2006) ("To establish a substantive due process violation, a plaintiff must first both carefully describe that right and establish it as 'deeply rooted in this Nation's history and tradition.' [*Glucksberg,* 521 U.S. at 720–21 [117 S.Ct. 2258]]. If the right is so deeply rooted—if it is fundamental—we subject it to more exacting standards of review. If it is not, we review only for a rational basis.").

### 2. Procedural Due Process

The United States Supreme Court has previously addressed the importance of the right to divorce in the context of procedural due process. In *Boddie v. Connecticut*, the appellants lacked access to the courts and were denied any means of dissolving their marriages. This was unconstitutional because "persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." 401 U.S. at 377, 91 S.Ct. 780. The Court held that process was required to allow individuals to "mutually liberate themselves from the constraints of legal obligations that go with marriage." *Id.* at 376, 91 S.Ct. 780. However, the Court stated, "The legitimacy of the State's monopoly over techniques of final dispute settlement, even where some are denied access to its use, stands unimpaired where recognized, effective alternatives for the adjustment of differences remain." *Id.* at 375–76, 91 S.Ct. 780. "The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Id.* at 378, 91 S.Ct. 780.

Here, parties to a void marriage may sue to have the marriage declared void under the Family Code. TEX. FAM. CODE § 6.307. Though voidance procedures do not afford the same benefits as divorce, they offer process and are an effective alternative to divorce procedures. They allow for the settlement of property disputes, the attachment of suits affecting the parent-child relationship (SAPCRs), and other legal process incidental to the dissolution of a purported marriage. By providing for the "adjustment of differences" following a marriage valid in another jurisdiction, voidance procedures allow for a meaningful opportunity to be heard. Therefore, I conclude that the voidance procedures outlined in Chapter 6 of the Texas Family Code provide adequate procedural protections as *Boddie* requires.

### B. Equal Protection

The Fourteenth Amendment's Equal Protection Clause prohibits each state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. The United States Supreme Court has clarified that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)). Naylor and Daly argue that construing Texas law to bar jurisdiction treats same-sex couples differently from opposite-sex couples. The State responds that homosexual persons are not a suspect class, and that Texas law is rationally related to a legitimate government purpose.

### 1. Level of Constitutional Scrutiny

"When a state distributes benefits unequally, the distinctions it makes are subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment." *Zobel v. Williams*, 457 U.S. 55, 60, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982). A law will generally survive that scrutiny if the distinction rationally furthers a legitimate state purpose. *Id.* There are times, however, when strict scrutiny is warranted. For example, in *Shapiro v. Thompson*, the United States Supreme Court held that reserving benefits to one group based solely upon residency requirements constituted invidious discrimination for which the government interests were not compelling. 394 U.S. 618, 627, 633–34, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Here, then, to determine the constitutionality of the historical

take on marriage, it is first necessary to determine the level of review.

In *Windsor v. United States,* the Second Circuit classified gays and lesbians as a "quasi-suspect class," requiring the government to prove that the Defense of Marriage Act was substantially related to furthering an important government interest. 699 F.3d 169, 185 (2d Cir.2012). But on appeal, the Supreme Court relied on animus to invalidate DOMA; Congress could not act out of a bare desire to injure a particular group. *See United States v. Windsor,* 133 S.Ct. at 2693–94. Similarly, in *Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), the Supreme Court examined an amendment to the Colorado Constitution that prohibited legislative, judicial, or executive protection of gays and lesbians. The Court invalidated the law relying not on a higher level of scrutiny, but on a finding of animus. *Id.* at 631, 635, 116 S.Ct. 1620. This was "merely an application of the usual rational-basis test." *See Lyng v. Int'l Union,* 485 U.S. 360, 370 n.8, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988). The Court held the laws had no legitimate objective and were accordingly unconstitutional. Importantly, however, the Supreme Court did not identify homosexuals as a suspect class or apply heightened scrutiny to laws targeting them. Similarly, I would test state laws limiting marriage to one man and one woman for whether they are rationally related to a legitimate state interest.

### 2. *Rational–Basis Review*

When laws create a classification scheme without burdening a fundamental right or targeting a suspect class, the laws are "presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne,* 473 U.S. at 440, 105 S.Ct. 3249; *see also Rom-*

*er,* 517 U.S. at 631, 116 S.Ct. 1620. Here, the State's stated purpose is "to encourage stable family environments for procreation and the rearing of children by a mother and a father." The United States Supreme Court has long recognized the importance of marriage and procreation, declaring them "fundamental to the very existence and survival of the race." *Skinner v. State of Okla. ex rel. Williamson,* 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); *see also Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 65, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973) (stating fundamental privacy right "encompasses and protects the personal intimacies of the home, the family, marriage, motherhood, procreation, and child rearing"). If these rationales are "fundamental," then there is no doubt they are legitimate.

These interests rationally relate to limiting divorce to those who have entered into a marriage recognized as valid by the Texas Constitution and the Texas Family Code. Two people cannot "divorce" without first being "married." To grant the divorce is to acknowledge the marriage, and to acknowledge that two people of the same sex can be married is to undermine the State's interest in preserving the traditional definition of marriage—that of furthering stable family environments for procreation and the rearing of children by a mother and a father.

In effect, Naylor and Daly invoke the Equal Protection Clause to redefine what divorce is. Yet, if "[b]y history and tradition the definition and regulation of marriage . . . has been treated as being within the authority and realm of the separate States," *Windsor,* 133 S.Ct. at 2689–90, then surely the meaning of divorce is as well. The State's concept of divorce (and marriage) does not refuse to "treat like cases alike," but instead declares traditional marriage and same-sex marriage to be

by their very natures "unlike." *Cf. Vacco v. Quill,* 521 U.S. 793, 799, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997) ("[The Equal Protection Clause] embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly."). In light of the State's interest in procreation and the raising of children by a mother and a father, this difference is apparent. Indeed, other laws (and commonly accepted ones) restrict marriage based on the assumption that it involves two persons capable, at least in the abstract, of procreation. Laws voiding marriages between certain close relatives, *see* TEX. FAM. CODE § 6.201, prove this point. The State has advanced certain policy decisions, and it is not for the judiciary to second-guess them. Rather, the judiciary need only find that the State's choice—the result of the democratic process—is within the broad range of options allowed by the U.S. Constitution.

The State's concept of divorce (and marriage) does not withhold access based on a protected status to what the people of Texas have defined as a valid marriage. The State's concept of divorce (and marriage) is not motivated by animus toward a particular group; it is based on a historical understanding of what "marriage" actually is and how this fosters a healthy family environment for children. The State's concept of divorce (and marriage) does not deprive individuals of a fundamental right, for there has never been a fundamental right to marry someone of the same sex. And the State's approach to divorce is rationally related to preserving the traditional definition of marriage, which furthers the State's interest in fostering stable families where children are raised by a mother and a father. Whether the State's means of achieving its interest is wise or unwise is not a question for this Court, but for the people of this State, and they have spoken. I conclude that section 6.204 does not violate the Equal Protection Clause of the Fourteenth Amendment.

### C. Full Faith and Credit

Article IV, Section 1, of the United States Constitution provides: "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof." U.S. CONST. art. IV, § 1. In this case, Congress has clearly prescribed the effect of same-sex marriage laws in other states. Section 2 of the Defense of Marriage Act, which was not at issue in *Windsor*, provides:

> No State, territory, or possession of the United States, or Indian tribe, shall be required to give effect to any public act, record, or judicial proceeding of any other State, territory, possession, or tribe respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State, territory, possession, or tribe, or a right or claim arising from such relationship.

Defense of Marriage Act § 2(a), 28 U.S.C. § 1738C. Texas, therefore, is not required to "give effect to" Naylor and Daly's marriage in Massachusetts.

Furthermore, it would be against Texas state policy to recognize Naylor and Daly's same-sex marriage. In *Nevada v. Hall,* the Supreme Court recognized a public-policy exception to the Full Faith and Credit Clause to the extent Congress does not prescribe otherwise. 440 U.S. 410, 421–22, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979) ("[T]his Court's decision in *Pacific Insurance Co. v. Industrial Accident Comm'n,* 306 U.S. 493, 59 S.Ct. 629, 83 L.Ed. 940, clearly establishes that the Full

Faith and Credit Clause does not require a State to apply another State's law in violation of its own legitimate public policy."). When it comes to same-sex marriage, Congress has not prescribed otherwise; indeed, it has specifically endorsed states' rights to not give effect to same-sex marriages formed in other states.

In *Castilleja v. Camero,* a lottery-proceeds case, we outlined the "test for refusing to enforce a right lawfully arising in another jurisdiction":

> To justify a court in refusing to enforce a right of action which accrued under the laws of another state, because against the policy of our laws, it must appear that it is against good morals or natural justice, or that for some other reason the enforcement of it would be prejudicial to the general interests of our own citizens.

414 S.W.2d 424, 427 (Tex.1967) (quoting *California v. Copus,* 158 Tex. 196, 309 S.W.2d 227, 232 (1958)). In this instance, the State has made clear that promoting the unions of opposite-sex couples is intended to benefit the citizens of Texas by encouraging procreation and child-rearing by both a mother and a father. To treat opposite-sex couples and same-sex couples the same would prejudice that aim. In other words, the *Castilleja* test is satisfied. As Congress has authorized Texas to not recognize same-sex marriages, and as Texas has a strong public policy against doing so, the Full Faith and Credit Clause is not violated. When marriage has one meaning in Massachusetts, and another in Texas, the Full Faith and Credit Clause does not require Texas to apply Massachusetts' definition to Naylor and Daly.

### D. Right to Travel

"[F]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution."

*United States v. Guest,* 383 U.S. 745, 758, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966). In *Attorney General of New York v. Soto-Lopez,* the Supreme Court held that "[a] state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses 'any classification which serves to penalize the exercise of that right.'" 476 U.S. 898, 903, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986) (citations omitted) (internal quotation marks omitted). Naylor and Daly present no evidence that Texas law has deterred travel. Nor is there any evidence that the Legislature intended to deter travel by enacting section 6.204 of the Family Code, especially because it did not restrict the availability of voidance procedures. In addition, the State does not penalize same-sex couples for traveling to Texas; these couples are treated the same as same-sex couples native to the state. The State merely seeks to preserve the traditional definition of marriage, applying this definition equally to individuals whether they migrated to Texas or not.

In *Saenz v. Roe,* the Supreme Court held:

> The "right to travel" discussed in our cases embraces at least three different components. It protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.

526 U.S. 489, 500, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999). Citizens of other states are welcome to freely travel into and out of Texas with the assurance that they will be treated no differently from Texas residents. I therefore conclude that

section 6.204 does not violate the right to travel.

\* \* \*

I conclude that the underlying divorce suit attacks the validity of our constitutional and statutory prohibition on same-sex marriage. I further conclude that the trial court is prohibited by state law from granting a divorce in this case and can only void the marriage or dismiss the case. I finally conclude that Texas law declaring same-sex marriages void does not violate the federal Constitution. I would accordingly reverse the judgment of the court of appeals and remand to the trial court for further proceedings consistent with these conclusions. Because the Court does not, I respectfully dissent.